IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ERIC MUELLER and CORISSA D. MUELLER, husband and wife, individually, and on behalf of TAIGE L. MUELLER, a minor, and on behalf of themselves and those similarly situated, | ) ) ) ) ) ) ) | Case No. CV-04-399-S-BLW **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| APRIL K. AUKER, KIMBERLY A. OSADCHUK, JANET A. FLETCHER, BARBARA HARMON, LINDA RODENBAUGH, THE CITY OF BOISE, DALE ROGERS, TED SNYDER, TIM GREEN, RICHARD K. MacDONALD, and ST. LUKE'S REGIONAL MEDICAL CENTER, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## INTRODUCTION

The Court has before it numerous pending motions.  The Court heard oral

argument and took the motions under advisement.  For the reasons expressed

below, the Court will (1) grant summary judgment for Officers Snyder & Green;

(2) grant summary judgment in part to the State defendants, finding that they have

**Memorandum Decision and Order – Page 1**

qualified immunity for all claims except for the claim that they failed to give post-deprivation notice to Eric Mueller, and will grant summary judgment to the Muellers on that claim; (3) grant summary judgment in part for Detective Rogers, finding he has qualified immunity for all claims against him except those alleging he failed to give pre- and post-deprivation notice to Eric Mueller, and will grant summary judgment to the Muellers on those notice claims; (4) grant summary judgment in part to the City, retaining for trial the issues whether the City's policies on seeking judicial resolution and notifying absent parents caused constitutional deprivations; and (5) grant summary judgment in part to Dr. Macdonald, retaining for trial the issue whether he misled Detective Rogers by exaggerating the risk to Taige Mueller for the purpose of using Detective Rogers' statutory authority to secure medical treatments for Taige.

## FACTUAL BACKGROUND

On August 12, 2002, Corissa Mueller became concerned when her five-week-old infant, Taige, began running a fever of about 99 degrees. Corissa called Dr. Karen Erickson, a naturopathic physician who had delivered Taige and had been providing care. They agreed that Taige might have a mere cold, the same one that other family members had passed around recently. But "to be on the safe side," Dr. Erickson suggested that Corissa take Taige to the hospital. *See Corissa*

**Memorandum Decision and Order – Page 2**

*Mueller Deposition* at p. 113.  Dr. Erickson explained that the hospital physicians would want to "automatically start her up on an antibiotic regimen and perform a spinal tap" in order to check for meningitis.  *Id*. at pp. 112-113.

When Corissa took Taige's temperature again, it had risen to 100.8.  *Id*. at p. 141.  Corissa talked with her husband, Eric, and they decided that Corissa would take Taige to St. Luke's Hospital while Eric remained home with their son.

Corissa brought Taige to the Hospital's emergency room just after 10:00 p.m. on the evening of August 12, 2002.  There, Taige was examined by emergency room physician Dr. Richard Macdonald.  He found that Taige was running a fever of 101.3, appeared ill, was slightly lethargic and fussy, with a delayed capillary refill and a slight rash.  *See Dr. Macdonald Deposition* at pp. 78-83.

Dr. Macdonald was concerned that Taige may have meningitis or some other serious bacterial infection.  He recommended to Corissa that a full septic workup be done, including various lab tests, a spinal tap and the administration of antibiotics.  *Id*. at p. 83.  The spinal tap would take fluid from Taige's spinal column to determine if she had meningitis.  Dr. Macdonald also stressed that time was of the essence and "that these babies can go from bad to worse very quickly." *See Corissa Mueller Deposition* at p. 145.  Corissa recalls him explaining that

**Memorandum Decision and Order – Page 3**

Taige had a 5% chance of having meningitis.  *Id*. at p. 146.

Corissa gave her consent to the lab tests, but wanted to wait for their results before proceeding with a spinal tap or antibiotics.  *Id.* at p. 143.  She felt that Taige may just have a cold or the flu.  *Id.*  Her objections were based on her own research that led her to conclude that the risks of meningitis were quite low, around 1%, and that the risks of treatment outweighed the risks of foregoing treatment.  *Id.* at pp. 131-32, 157.

When the lab tests came back, Dr. Macdonald explained them to Corissa. They basically ruled out a urinary tract infection or ear infection, but not meningitis.  *Id*. at p. 155.  Corissa understood that the only way to rule out meningitis was to do a spinal tap.  *Id.*

At this point, about 12:30 a.m. on August 13, 2002, Taige's temperature had dropped to 98.9 after she received an intravenous administration of fluids.  Upon hearing this, Corissa could find no reason to consent to a spinal tap and antibiotics. *Id*. at p. 162.

In response to Corissa's objections, Dr. Macdonald consulted with Dr. Noreen Womack, a board-certified pediatrician.  *See Womack Deposition* at p. 53. She agreed that for five-week-old infants with Taige's symptoms the standard of care was to do a spinal tap and administer antibiotics.  *Id.*  at pp. 16, 18-19.  She

**Memorandum Decision and Order – Page 4**

testified that Taige had a risk of between 1 and 8 percent of having a serious bacterial infection.  *Id.*  Dr. Womack recommended that Dr. Macdonald contact a social worker if Corissa continued to refuse to consent to the spinal tap and antibiotics.  *Id.* at p. 22.

When Corissa again refused to consent, Dr. Macdonald spoke with the hospital's social worker, Bob Condon, informing him about the situation and Corissa's refusal to consent to treatment.  Condon informed Dr. Macdonald that he (Condon) was required to contact Child Protective Services (CPS), a division of the Idaho Department of Health and Welfare.  *See Dr. Macdonald Deposition* at p. 169

At about 11:39 p.m. that evening, Condon called April Auker, a State social worker who was the on-call Risk Assessment Worker that night.  *See Auker Deposition* at p. 31.  Condon explained the situation and asked Auker to come to the Hospital.  Auker arrived at the Hospital's emergency room about midnight.

Condon also contacted two police officers, Ted Snyder and Tim Green.  The three – Auker, Snyder & Green –  discussed the case with Dr. Macdonald, and their conversation was captured in part on Officer Snyder's belt recorder.  In a transcript made from that recording, Dr. Macdonald explains the risks faced by Taige as follows:  "[I]f I took a hundred kids with this same presentation probably 95% of

**Memorandum Decision and Order – Page 5**

them would end up having just some viral illness; will get better in a couple of days; would be fine.  I know that about 5 out of those 100 if I let them go home will die.  Will die of meningitis." *See Transcript* at p. 4.  After some further discussion, Dr. Macdonald states that "if I practice medicine the way she [Corissa] is wanting me to practice it, it would . . . I'd lose five out of a hundred kids.  See what I'm saying?" *Id.* at p. 5.

Officers Snyder and Green contacted their superior, Detective Rogers, and requested that he come to the Hospital.  Shortly thereafter, Detective Rogers arrived and discussed the case with Dr. Macdonald.  Detective Rogers recalled that "Dr. Macdonald explained to me that there was a 5 in 100 chance that Taige Mueller could die within hours if the spinal tap was not performed and the antibiotics not given." *See Rogers' Affidavit* at p. 3.

Dr. Macdonald recalls differently.  He remembers that he told Detective Rogers that "there could be a three to five percent chance [Taige] could have [a] serious bacterial infection; meningitis or sepsis." *See Macdonald Deposition* at p. 189.

His version is substantially different from Detective Rogers'.  Depending on whose version is correct, the risk was either assessed as a 5% risk of *death* or a 5% risk of *serious bacterial infection*.

**Memorandum Decision and Order – Page 6**

The Muellers allege that the record supports even a third version of the risk assessment.  They contend that certain answers by Dr. Macdonald in his deposition raise a question whether he told Detective Rogers that the risk of death was .25%.  The Muellers point to certain testimony by Dr. Macdonald in response to questions from the Muellers' counsel.  They argue that his testimony could be read to mean that children with Taige's symptoms had a 5% risk of meningitis, and that, of that group, 5% of those left untreated would die.  *See Dr. Macdonald's Deposition* at p. 139.  The implication from that testimony is that the risk of death is 5% of 5%, or .25%.  This is close to what the Muellers' own expert, Dr. Shapiro, states is the true risk.  If Dr. Macdonald conveyed this low risk figure to Detective Rogers, the Muellers would have a stronger case against the Detective for depriving them of Taige's custody with such a scant chance of imminent danger.

However, at this point in the deposition, the Muellers' counsel was not asking Dr. Macdonald what he told Detective Rogers that evening, but rather was asking a hypothetical question about risk in the abstract.[1]  And when counsel sought to clarify Dr. Macdonald's answer by asking him if he meant that the risk was 5% of 5%, Dr. Macdonald responded "[t]hat's not what I said."  *Id.*

---

[1]  The question posed by counsel to Dr. Macdonald was as follows: "You said that three to five percent of infants with Taige's presentation could have a serious bacterial disease.  Of these, how many would have a serious bacterial disease."  *See Dr. Macdonald Deposition* at p. 138.

**Memorandum Decision and Order – Page 7**

Later in the deposition, the Muellers' counsel approached the issue from a different angle, no longer inquiring generally about risk but now asking Dr. Macdonald *what he told Detective Rogers.*  Dr. Macdonald responded, "[t]here could be a three to five percent chance this child could have a serious bacterial infection; meningitis or sepsis."  *Id*. at p. 189.

There is no evidence in the record that Dr. Macdonald ever used the words "5% of 5%" or ".25%" in talking with Detective Rogers.  At most, these figures are teased out of some vague and confusing deposition testimony of Dr. Macdonald. And when Dr. Macdonald is directly asked if that is what he told Detective Rogers, he responded that it was not what he said.  Counsel never followed up on that response in the deposition.  All the participants – Dr. Macdonald, Detective Rogers, Officers Snyder & Green, April Auker, and Corissa Mueller – testified that the figure used by Dr. Macdonald was 5%.  None of them testified that the figure was "5% of 5%" or ".25%."

The record therefore provides no support for the Muellers' claim that Dr. Macdonald told Detective Rogers that the risk of death was .25%.  The risk was definitely assessed at 5%; the question is, 5% *of what*?  On that point, the testimony differs, as discussed above.  Depending on whose version is correct, the risk was either assessed as a 5% risk of *death* or a 5% risk of *serious bacterial*

**Memorandum Decision and Order – Page 8**

*infection*.  The Court will discuss later in this decision the legal impact of this question of fact.

Moving on, it is undisputed that Dr. Macdonald explained to Detective Rogers (1) that the risk could be completely removed with treatment, *see Rogers Deposition* at p. 25, (2) that the risk of treatment was less than the risk of foregoing treatment, *see Rogers Affidavit* at pp. 3-4, and (3) that the standard of care was to do a spinal tap and administer antibiotics.  *Id* at ¶ 9, p. 3.

Dr. Macdonald also told Detective Rogers that "he had a three-hour window of opportunity, and that we were already into that window of opportunity by over two hours, two hours and 15 minutes, and we needed to make a decision."  *See Rogers Deposition* at p. 36.[2]  Thus, Rogers believed that treatment for Taige needed to start within 45 minutes.  *Id*.

In addition, Dr. Macdonald explained to Detective Rogers that "if Taige left [the Hospital] without receiving treatment, there was a chance she could become increasingly ill and die before Mrs. Mueller could return to the hospital."  *See Rogers Affidavit* at p. 4; *see also Rogers Deposition* at p. 42 (wherein Rogers states

---

[2]  The Muellers dispute this, asserting that Dr. Macdonald "did not tell Rogers that treatment needed to begin within a three-hour period (or any particular period) . . . ."  *See Plaintiffs' Response to City Defendants' Statement of Undisputed Facts*, at p. 2, ¶ 12.  In support of this allegation, the Muellers cite page 166 of Exhibit G attached to the Zahn Affidavit.  There is no page 166 attached to Exhibit G of the Zahn Affidavit.

**Memorandum Decision and Order – Page 9**

his belief "that by the time she [Corissa Mueller] realized she needed to take her [Taige Mueller] back, it would have been too late").

Detective Rogers talked with Corissa Mueller on three occasions before declaring Taige in imminent danger. Corissa recalls telling Detective Rogers that she would not give consent because the risks of treatment outweighed the risks of illness. Corissa explained that the spinal tap "could cause an infection from the needle puncturing the spine. That you can cause meningitis itself from that procedure. That it can cause paralysis, can cause brain damage or severe headaches." *See Corissa Mueller Deposition* at p. 164. Corissa also explained her objection to the use of antibiotics. *Id.* At some point, Corissa called her husband Eric, who was at home watching their other young son, and told him that "Taige was doing better and that she was going to check out." *See Eric Mueller Deposition* at p. 73.

Dr. Macdonald offered to allow Corissa to obtain a second opinion. She declined because she was "already getting my second opinion through Dr. Erickson." *See Corissa Mueller Deposition* at p. 187.

Detective Rogers considered calling Eric Mueller but decided against it because "Corissa Mueller was quite adamant in [her] refusal," and "I believed Taige was running out of time to receive needed treatment and did not want to

**Memorandum Decision and Order – Page 10**

waste valuable time by having Eric and Corissa Mueller argue over Dr. Macdonald's recommendations.  Furthermore, I was concerned that even if Eric Mueller consented and Corissa Mueller did not, that I would then be faced with a tug-of-war with Corissa to enforce Eric Mueller's treatment decision." *See Second Affidavit of Rogers* at p. 3.

The Hospital's social worker Bob Condon also decided not to call Eric on the ground that "even if . . . he had provided consent, we had [Corissa] in the hospital not providing consent.  We would have had to follow her wishes.  She was there.  She was holding the child." *See Condon Deposition* at p. 37.

In making his decision on imminent danger, Detective Rogers testified that he "always consider[s] whether it may be possible to obtain a court order." *See Rogers Second Affidavit* at ¶ 5, p. 3.  In this case, he decided not to call a judge because "[i]n my professional experience, it usually takes 2-3 hours to obtain judicial authorization for warrants and other such matters." *See Rogers Affidavit* at ¶ 47, p. 7.  In his deposition, Detective Rogers stated that this 2-3 hour estimate also applies to obtaining a court authorization for treatment in an imminent danger case, although he had never sought one prior to the Mueller incident. *See Rogers Deposition* at p. 38-39.  In a later-filed affidavit, Detective Rogers states that "I believed that it would take at least 20-30 minutes just to have the on-call

prosecutor contact the on-call magistrate.  I did not believe I would be able to obtain approval from the judge within the 45 minute time frame."  *See Rogers Third Affidavit* at ¶ 2, p. 2.

Detective Rogers asked April Auker if the State was ready to take custody if he declared Taige in imminent danger.  Auker responded in the affirmative.  *See Rogers Deposition* at p. 16.  When an officer declares a child in imminent danger under Idaho Code § 16-1612, and turns a child over to the State Department of Health and Welfare, the State considers that it now has custody of that child.  *See Alexander Deposition* at p. 17-18.

Detective Rogers recalls that when he asked Dr. Macdonald for his recommendation, "Dr. Macdonald responded that his professional recommendation was that antibiotics and a spinal tap be performed immediately.  Dr. Macdonald explained that the risk involved in treating Taige Mueller was less than the risk involved in not treating her."  *See Rogers' Third Affidavit* at pp. 3-4; *see also Dr. Macdonald Deposition* at p. 194 (wherein Dr. Macdonald is questioned whether he recommended that Taige Mueller be declared in imminent danger and he answered, "[y]es").

At this point it was early morning – about 1:40 a.m. – on August 13, 2002.  Detective Rogers had decided in his own mind that Taige was in imminent danger.

**Memorandum Decision and Order – Page 12**

To avoid "any type of physical struggle with Corissa and the baby," Detective

Rogers had Dr. Macdonald ask to examine Taige so that Corissa would not be

holding the baby while Detective Rogers informed her of his decision.  *See Rogers*

*Deposition* at p. 58.

Once Dr. Macdonald had Taige, Detective Rogers led Corissa out of the

room and into the hallway.  There, he informed her that he was declaring Taige in

imminent danger, that custody was being turned over to the State, and that there

would be a court date the next day for a custody hearing.  *Id*. at p. 122-23.[3]

At this point, Detective Rogers testified, Corissa "started crying, screaming

kind of hysterically," and tried to walk back into the room.  *Id*. at p. 61.  Corissa

recalls that she was "crying" and "quite emotional."  *See Corissa Mueller*

*Deposition* at p. 173.  She also testified that she was "so scared and so shocked. I

didn't understand what was going on."  *Id*.

Detective Rogers asked Officers Green and Snyder to escort Corissa to

---

[3] Detective Rogers stated that he "declared Taige Mueller in imminent danger pursuant to Idaho Code Section 16-1612 . . . ."  *See Rogers' Affidavit* at ¶ 49, p. 8.  The Muellers point to no evidence in the record to the contrary.  Indeed, in their Second Amended Complaint, the Muellers allege that Detective Rogers purported to act pursuant to I.C. § 16-1612.  *See Second Amended Complaint* at ¶ 28.  Nevertheless, the Muellers cite to the City defendants' Answer to that Complaint to argue that Detective Rogers "has denied purporting to act pursuant to former I.C. §16-1612."  The argument is specious.  The City defendants' denial was based on the "legal conclusions" in the Muellers' assertion as to what "[t]hat statute [I.C.§ 16-1612] permits . . . ."  At no point in the record does Detective Rogers ever deny acting pursuant to I.C. §16-1612.  His testimony on this point, and the complete lack of any contrary evidence, settles the issue.

**Memorandum Decision and Order – Page 13**

another room so that she would not interrupt the treatment of Taige.  *See Rogers Deposition*. at pp. 62-63.  Bob Condon recalls that as the Officers escorted Corissa down the hallway, she was "struggling to get back into the room to get back to her child.  She was also yelling and screaming trying to get back into the room."  *See Condon Deposition* at p. 62.  Officer Snyder recalls that Corissa was "very upset [and] tried to go back inside the room."  *See Snyder Deposition* at p. 61.  As the Officers escorted her down the hallway to another room, Corissa was, according to Officer Snyder, "screaming and yelling . . .[s]he was pulling against us, pulling back towards the room.  At one point she . . . wouldn't move [so] we . . . physically escort[ed] her down the hall and to the room."  *Id*. at p. 63.

Corissa recalls that she was "crying and pleading" but not screaming.  *See Corissa Mueller Deposition* at p. 219.  She describes Officers Snyder and Green at this time as being "understanding and kind."  *Id*. at p. 220.

The room was about six by eight feet in size.  *See Snyder Deposition* at p. 65.  Officer Snyder testified that while in the room, Corissa "was still very upset. Still yelling, crying.  Still wanting to get out and go down the hall."  *Id*.  This was about 10 to 15 minutes after Corissa had been escorted away from the exam room, and she describes herself as "still emotional."  *See Corissa Mueller Deposition* at p. 220.

**Memorandum Decision and Order – Page 14**

The Officers told Corissa that she was free to leave only after she got herself "under control." *See Snyder Deposition* at p. 70. Officer Snyder refused to allow Corissa to make any phone calls, despite her plea to call her husband. *See Belt Recorder Transcript* at p. 9. Officer Snyder stated that he did not want her telephoning anyone until she had talked to Detective Rogers and could make a "knowledgeable phone call." *Id.* He also considered the phone a potential weapon and Corissa a threat because "she was obviously upset . . . and she could obtain a weapon or attack me in some way." *See Snyder Deposition* at p. 69. He told her that she could use the phone after she had talked to Detective Rogers and obtained copies of the notice of court hearing. *See Snyder Affidavit* at ¶ 34, p. 6.

After some time, Detective Rogers entered the room. At her deposition, Corissa estimated he came into the room after she had been there for "[t]en to fifteen [minutes]." *See Corissa Mueller Deposition* at p. 221. In her errata sheet, she changed that estimate to "I'm not sure. It could have been as long as 30 or 45 minutes." *See Errata Sheet* at p. 4. Officer Snyder estimates the time spent in the room was about "ten minutes or so." *See Snyder Deposition* at p. 77.

During that time, according to Officer Snyder, Corissa "wasn't free to leave just then." *Id.* He was detaining her in the room because "[s]he's still acting irrationally and upset, needed to be calmed down before we allowed her . . . out

**Memorandum Decision and Order – Page 15**

into the rest of the hospital and cause [sic] problems."  *Id*. at p. 82.  He was concerned that she would "run out the . . . room door and attempt to reenter the exam room where her daughter was located."  *See Snyder Affidavit* at ¶ 33, p. 6.

Detective Rogers handed her the notice of her court date.  April Auker then came in to have Corissa sign a consent form.  *See Corissa Mueller Deposition* at p. 221.  Corissa refused to sign it, and Auker left the room.  *Id.*

Corissa also testified that Detective Rogers continued the phone ban that Officer Snyder had first placed on her.  *Id*. at p. 228.  Detective Rogers told her that she could use the phone only after she got herself "under control."  *See Detective Rogers Deposition* at p. 69.

Corissa testified that Detective Rogers then told her she was free to go.  She testified that as she got up to leave, "he [Detective Rogers] changes his mind . . . [a]nd butts up against me and pushes me back in my chair."  *Id*. at p. 223. Corissa recalls that Detective Rogers "didn't use arms; he just used his front body." *Id*. at p. 224.

Eventually, she was escorted to the hospital lobby where she phoned her husband.  It was now about 3:00 a.m., and Eric recalls that Corissa was "hysterically crying that they had taken our baby."  *See Eric Mueller Deposition* at p. 75.

**Memorandum Decision and Order – Page 16**

Eric testified that this call was the first he received notifying him that Taige's custody had been transferred and that Taige was being given medical treatment, including a spinal tap.  *See Eric Mueller Deposition* at p. 75-76.  This call was made – according to Corissa's deposition testimony – about "half an hour" after Detective Rogers had declared Taige in imminent danger.  Corissa later changed that testimony to "perhaps an hour or so."  *See Errata Sheet* at p. 4.

It is undisputed that Eric Mueller never received any notice from Detective Rogers – or any State or Hospital official – that (1) the police were considering depriving him of custody of his daughter, (2) the police had transferred custody of Taige to the State, and (3) the State had consented to begin a spinal tap on Taige and administer antibiotics to her.  Corissa has stated that "[a]t no time did [Detective] Rogers or anyone else ask me whether my husband would consent to the treatment Dr. Macdonald recommended."  *See Corissa Mueller's Statement* at ¶ 4, p. 2.

After completing the call to Eric, Corissa returned to the exam room where Taige was located.  There, Officer Snyder recalls, Corissa "began arguing with Detective Rogers over Taige's removal."  *See Snyder Affidavit* at ¶ 42, p. 7.  Corissa recalls that she returned to the exam room to request two things – to obtain a second opinion and to be allowed to "stand there and just watch because I was

**Memorandum Decision and Order – Page 17**

outside the exam room but Taige was inside." *See Corissa Mueller Deposition* at

p. 231.  The Officers, she testified, accused her of arguing and escorted her away

again.  *Id.*

Meanwhile, April Auker contacted her superiors to obtain consent for

treating Taige.  Linda Rodenbach, the State's Program Director, authorized Auker

to permit Dr. Macdonald to administer the medical treatment that he was

recommending.  *See Rodenbach Deposition* at pp. 56-57.  Auker then went to the

room where Taige was being held, and told Dr. Macdonald and Nurse Scott

Beseman that she had consent.  *See Beseman Deposition* at p. 38 ("I remember

[Auker] coming into the room and saying, 'We have consent'").  Dr. Macdonald

recalls that Auker gave consent to do whatever he thought appropriate to treat the

child.  *See Dr. Macdonald Deposition* at p. 222.  There was a written consent

signed to do the lumbar puncture and the rest of the consent was verbal.  *Id.*

Dr. Macdonald performed the lumbar puncture sometime around 3:00 a.m.

on August 13th.  *Id.* at 236.  He also authorized the administration of antibiotics

and steroids to Taige.  *See Beseman Deposition* at pp. 43-45.  The lumbar puncture

showed that Taige's spinal fluid was clear, indicating that meningitis was not

present.

Later that morning Corissa Mueller was reunited with Taige, and her

**Memorandum Decision and Order – Page 18**

husband arrived.  *Id*. at p. 252.  She stayed with Taige in the hospital the night of August 13, 2002.  The next day, August 14, 2002, at the court hearing, the custody of Taige was turned back over to the Muellers.

The evidence shows that Corissa and Eric Mueller are loving parents who at all times had the best interests of Taige in mind.  There is absolutely no evidence of abuse or neglect, and no allegation that either parent was in any way unfit.

## ANALYSIS

### 1.    <u>Introduction</u>

The Muellers seek summary judgment that their constitutional rights were violated.  The defendants respond that there was no deprivation, but even if there was, they have qualified immunity from suit.

In resolving similar disputes, courts often skip past identifying the constitutional rights at issue and proceed directly to the qualified immunity analysis, assuming the rights as asserted by the plaintiffs.  The Supreme Court frowns on that practice.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has held that, as a threshold matter in § 1983 cases where the defense of qualified immunity is raised, courts must first explain what constitutional rights are at issue in the case before it.  *Id.*  The Supreme Court was concerned that "the law might be deprived of this explanation were a court simply

to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Id.*

In accordance with that directive, the Court will identify first the core constitutional rights in this case. The Court will then determine whether those rights were violated (or whether questions of fact remain). Finally, the Court will turn to the issue of qualified immunity.

## 2.   <u>**Substantive Due Process – Parental Rights**</u>

The Due Process Clause of the Fourteenth Amendment protects the right of parents to make medical decisions for their children. *Troxel v. Granville,* 530 U.S. 57, 66 (2000). This is the "oldest of the fundamental liberty interests recognized by [the Supreme Court]." *Id*. at 57. At the same time, the State has a *parens patriae* interest in promoting the welfare of children and ensuring their physical safety. *See Santosky v. Kramer*, 455 U.S. 745, 766-67 (1982).

The parents' rights and the State's duty are not necessarily equal in strength, however. So long as the parents are fit – as is the case here – "there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68; *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that "our constitutional system long ago

rejected any notion that a child is the mere creature of the State . . .").

More specifically, when fit parents decline medical treatment for their minor child, the Due Process Clause clothes them with a presumption that they are acting reasonably.[4]  *Troxel*, 530 U.S. at 68; *Parham*, 442 U.S. at 602.  If the State wants to compel the minor child to undergo a medical treatment over the parents' objections, it is the State's burden to rebut that presumption at a judicial hearing by showing that no reasonable parent would decline the treatment.  *Id.*

No reasonable parent would decline treatment where the risks of foregoing treatment substantially outweigh the risks of treatment.  *See Custody of a Minor*, 379 N.E. 2d 1053 (Mass. 1978) (minor child compelled by court to undergo chemotherapy for leukemia, over parents' objections, because treatment had inconsequential side effects and would save child from certain death within months).  On the other extreme, the State cannot carry its burden where the risk of harm is slight.  *See Tenenbaum v. Williams*, 193 F.3d 581, 594 (2nd Cir. 1999) (holding that "[t]he mere possibility of harm [to a minor child from parents declining treatment] is not enough").

Between these extremes, there are cases where there is a close association

_____

[4]  The Court uses the term "fit" here to mean that there is no evidence that the parents are abusive or neglectful in any way, and the sole focus is on their refusal to permit treatment.

**Memorandum Decision and Order – Page 21**

between the risks of treatment and the risks of foregoing treatment.  Here, the child

may face danger either way, and there is no clear-cut safe option.  A difficult

choice – a choice that poses risks either way – should never trigger intervention by

the State.  With no obvious safe alternative, the State has no *parens patriae*

interest, and hence loses all claim to make decisions for the child.  It is now the

grim duty of the parents to make the call.

This was the situation faced in *In re Hudson*, 126 P.2d 765 (Wash. 1942).

There, a minor child suffered from a congenital deformity making her left arm

much longer than her right, rendering it useless.  *Id*. at 767.  Two physicians

recommended removal of the arm because "the child appears to be frail and is

suffering from the effects of this enormously heavy, useless extremity, which for

the sake of her general health should be removed."  *Id.* at 768.

The mother, fit in every way, objected because "there was too much of a

chance on her [the child's] life."  *Id.*[5]  On this point, the physicians had testified

that  "there is a fair degree of risk of life involved in the operation."  *Id.*

The court refused to order the amputation recommended by the physicians.

Recognizing that all options posed risks, the court relied on the "paramount right

---

[5]  As here, the mother's objections to the medical treatment were not based on any
religious belief.  *Id*. at 768.

**Memorandum Decision and Order – Page 22**

of parents" to override the recommendations of physicians.  *Id*. at 778.

*Hudson* properly applied the Due Process Clause principles discussed earlier.  When all options pose risks, it is the province of parents – not the State and not the medical professionals – to make the difficult decision.

The tipping point – the point at which parents lose their substantive due process right to decline medical treatment for their minor child and the State is allowed to exercise its *parens patriae* interest to compel the child to undergo the treatment – exists when, considering all the circumstances in a particular case, no reasonable parent would decline treatment.

## 3.    <u>Procedural Due Process – Right to a Judicial Hearing</u>

Parents have a procedural due process right to a judicial hearing if the State seeks to compel their minor child to undergo a medical treatment over their objection.  *Stanley v. Illinois*, 405 U.S. 645 (1972); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000).  The only exception is when the State has "reasonable cause to believe that the child is in imminent danger of serious bodily injury and . . . the scope of the intrusion is reasonably necessary to avert that specific injury." *Wallis,* 202 F.3d at 1138.  In the context of this case, the State has the authority, without prior judicial authorization, to compel a minor child to undergo specific medical treatment over parental objections only when the State has reasonable

cause to believe that the parents' refusal to approve that specific medical treatment places that child in imminent danger of serious bodily injury.

*Wallis* drew the "imminent danger" standard from Fourth Amendment cases that recognized the need for a "very limited exception" to the rule that a judge be involved.  *See e.g., Good v. Dauphin County Social Services*, 891 F.2d 1087, 1094 (9th Cir. 1989).  As will be discussed, under Idaho law, it is a police officer who, in essence, takes the place of a judge in those emergency situations where the officer determines that the minor is in imminent danger.

Without imminent danger, the officer cannot make the decision.  A judge must be called.  This preference for judicial resolution recognizes the difficult task in balancing the parents' rights (to have custody of their children and make medical decisions on their behalf) against the State's duty (to protect the child's welfare).  This task is the regular business of judges; hence the legal preference for judges to make the call.

Accordingly, when an officer encounters an emergency situation where a parent is refusing medical treatment for her child, the officer's threshold task is to determine whether there is time and means to contact a judge.  Only after determining that a judge cannot be contacted (due to time constraints, lack of availability, etc.) does the officer proceed to decide that which is constitutionally

assigned to the judge otherwise.

The Court agrees that "the sole focus should not be whether there is time to obtain a court order." *Doe v. Kearney*, 329 F.3d 1286, 1297 (11th Cir. 2003). Instead, determining whether the officer had time to contact a judge is simply one factor in determining whether a failure to hold a pre-deprivation judicial hearing was a procedural due process violation. *Id*. at 1297-98 (holding that the "subtle balancing [required under procedural due process analysis] cannot be properly accomplished when courts blunt the inquiry by simply asking whether there was time to get a warrant"); *see also, Memorandum Decision* (filed April 13, 2005).

The focus must be on the phrase "imminent danger."  It was not defined in *Wallis*.  Its common meaning has both a time and probability component.  It means that a danger is likely (the probability component) to occur at any moment or immediately (the time component).  *See Mabe v. San Bernardino County*, 237 F.3d 1101, 1109 (9th Cir. 2001) (citing need for "immediate" harm to justify due process exception).

The time component requires the officer to determine when the injury to the child will occur and whether there is time to contact a judge.  The probability component requires the officer to determine whether the injury is likely to occur.

The Muellers urge the Court to assign numerical restrictions to these time

**Memorandum Decision and Order – Page 25**

and probability components: "[I]f there is not some minimum level of risk associated with 'imminent danger of serious bodily injury' . . . the state could deprive parents of their right to make medical decisions whenever a doctor could assert that there was *some* chance of a serious consequence in a short time, no matter how slight . . . ."  *See Muellers' Reply Brief* at p. 3 (emphasis in original).

The Court shares that concern.  If risk is ignored in the imminent danger analysis, then doctors could have a veto power over parental rights – the parents will lose their rights whenever a doctor insists on treatment for a risk, however unlikely.

Assigning precise numerical benchmarks would certainly simplify the decision for the officer.  However, no case so holds.  Indeed, the Supreme Court has held that constitutionally mandated balancing tests, however difficult, must not be ignored so "that law enforcement may be made more efficient."  *Mincey v. Arizona*, 437 U.S. 385, 393 (1978).

Thus, the police officer must independently assess all relevant factors, including risk.  To give full recognition to the parents' rights, the officer cannot give a physician or other medical expert a "doctor's veto" by relying entirely on the physician's recommendation to the exclusion of other factors.  *See Hudson*, 126 P.2d at 767-68 (and discussion above).

**Memorandum Decision and Order – Page 26**

While this may appear to be an onerous burden to place on a police officer, working under chaotic emergency conditions, the law does take this into account. The officer need only have "reasonable cause to believe" that the child is in imminent danger.  *Wallis*, 202 F.3d at 1138.  Reasonable cause to believe "is not purely objective, but turns on the facts actually known [by the officer] in a particular case – facts from which a jury can infer that any reasonable person in the [officer's] position would have [believed the child was in imminent danger]." *United States v. Ching Tang Lo*, 447 F.3d 1212, 1232 (9th Cir. 2006).

Thus, even if the police officer's decision turns out to be wrong, there is no due process violation if a reasonable person, knowing what the officer knew, would have made the same decision.  However, neither this standard nor any other gives the officer *carte blanche* to ignore the constitutional balancing standards.

The Court therefore holds that the police officer, in determining whether a minor child has been placed in imminent danger of serious bodily harm by the parent's refusal to allow medical treatment, must consider all relevant factors, including the fitness of the parents, the risks of treatment compared with the risks of foregoing treatment, how soon the harm will occur, whether there is time to contact a judge, and any other factors given the circumstances.

**4.     <u>Procedural Due Process – Notice</u>**

**Memorandum Decision and Order – Page 27**

As part of their procedural due process rights, parents are entitled to notice, both before and after the State seizes their child for medical treatment purposes. *Wallis* held that barring an "urgent medical problem requiring immediate attention, the state is required to notify parents . . . *before* children are subjected to investigatory physical examinations." *Wallis*, 202 F.3d at 1141 (emphasis added).[6]

And once the State has seized the child, the parents have "a right arising from the liberty interest in family association to be with [their] children while they are receiving medical attention (or to be in a waiting room . . . if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted)." *Wallis*, 202 F.3d at 1142.  The *Wallis* decision stated that this right is "particularly compelling at such times, in part because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events."  *Id*.

## 5.    <u>Idaho Child Protective Act</u>

The State of Idaho codified a system for providing emergency medical care to children in the Child Protective Act.  Under that Act, a judge may authorize medical care for a child over the parents' objections if a physician informs the

---

[6]  While *Wallis* dealt with investigatory physical exams, its reasoning applies with equal strength to the medical treatments sought here, including a spinal tap and the administration of drugs.

**Memorandum Decision and Order – Page 28**

judge that "the life of the child may be greatly endangered without certain treatment."  *See* I.C. § 16-1616.  This statute directs the judge to "cause every effort to be made to grant each of the parents . . . an immediate informal hearing, but this hearing shall not be allowed to further jeopardize the child's life."

At times, police officers encounter emergencies that demand immediate action before a judge can be contacted.  For those situations, the Act provides that a "child may be taken into shelter care by a police officer . . . without [a court order] only where the child is endangered in his surroundings and prompt removal is necessary to prevent serious physical or mental injury to  the child . . . ."  *See* I.C. §16-1612.

The Act defines "shelter care" as "places designated by the [D]epartment of [Health and Welfare] for temporary care of children pending court disposition or placement."  *See* I.C. § 16-1602.  The Act also states that whenever a child is turned over to the State under any provision of the Act, the State has the duty to "secure adequate care" for the child.  *See* I.C. § 16-1601.

When a police officer acts pursuant to § 16-1612, he must (1) immediately take the child to a place of shelter, (2) notify the court of the action and the child's location, and (3) notify "each of the parents" that the child has been taken into shelter care, the type and nature of the shelter care, and that the child may be held

**Memorandum Decision and Order – Page 29**

there for a maximum of forty-eight hours, within which time there must be a shelter care hearing.  *See* I.C. § 16-1613.  In essence, the police officer is transferring custody from the parents to the shelter, in this case the State.

The Idaho Child Protective Act set up a process for judicial intervention in §16-1616, discussed briefly earlier.  This statute allows a judge to authorize medical or surgical care for a child when (1) "[a] parent . . . is not immediately available and cannot be found after reasonable efforts . . ." or (2) "[a] physician informs the court orally or in writing that in his professional opinion, the life of the child would be greatly endangered without certain treatment and the parent . . . refuses or fails to consent."[7]

The statute does not discuss who can invoke its provisions – that is, it does not expressly identify those persons who may call a judge and seek authorization for medical treatment of a child.  The City argues that because police officers are not "even mentioned in the statute," it does not  "authorize or require peace officers to take any action."  *See City's Response Brief* at p. 16.

The Court disagrees.  The fact that the statute does not restrict police from invoking its terms must be interpreted as an invitation, not a limitation.  This flows from the principle of statutory construction that statutes be interpreted consistently

---

[7] This statute is now Idaho Code §16-1627.

**Memorandum Decision and Order – Page 30**

with constitutional requirements if possible.  *See Bayes v. State*, 785 P.2d 660, 666

(Id.Ct.App. 1989).  By not prohibiting police from invoking its provisions, Idaho

Code § 16-1616 must allow police to use the statute, in order to implement the

constitutional preference for judicial intervention.

 The City also argues that in common practice, the police do not invoke Idaho

Code § 16-1616.  *See Judge Day Deposition* a pp. 81-83; *Fourth District Court's*

*Medical Treatment Protocol*.  Judge Day, a Judge in the State court system, cannot

recall any police officer ever invoking the statute.  *Id.*  The Fourth District Court

Protocol Manual is silent on whether the police may use the statute.  *Id.*

 This practice, however, cannot override the interpretative analysis set forth

above.  There is no principle of statutory construction that compels the Court to

give precedence to local practice over constitutional commands in interpreting a

statute.  The Court therefore finds that the statute allows an officer to call the on-

call judge either directly or through a prosecutor.

## 6. <u>State's Duties Under Idaho Child Protective Act</u>

 As discussed above, when an officer finds imminent danger, and invokes

Idaho Code § 16-1612, the officer turns the child over to the State Department of

Health and Welfare.  The State has the duty to "secure adequate care" for the child,

*see* I.C. § 16-1601, and thus is authorized to consent to medical treatment for the

**Memorandum Decision and Order – Page 31**

child.

The State is not free, however, to consent to any treatment that it sees fit. The State is confined by a constitutional mandate to limit the scope of the intrusion on parental rights to only that which is necessary to avoid the imminent danger. *Wallis*, 202 F.3d at 1138.  It is therefore crucial for State's representative to communicate with the officer.  The officer must identify the basis of his imminent danger decision so that the State will understand precisely what treatment must be performed to avoid the imminent danger.

The State must then not consent to any treatment beyond that necessary to avoid the imminent danger identified by the police officer in invoking Idaho Code § 16-1612.  The State must also do all within its power to limit the duration of the seizure of the child (*i.e.*, the child's stay in the hospital or other medical facility), so that it does not extend beyond the time needed for that treatment and necessary after-care.

7.     **Summary of Constitutional Rights**

To this point in the opinion, the Court has been identifying the constitutional rights pursuant to the direction given in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  To summarize, the parents have the following substantive and procedural due process rights that must be followed by the police when they

**Memorandum Decision and Order – Page 32**

encounter a situation where a physician is insisting on emergency medical treatment of a minor child over the objection of that child's parents where there is no evidence of abuse or neglect and the parents' objections are not religiously-based:

(1)     The officer must determine if there is reasonable cause to believe that the child is in imminent danger of serious bodily injury.  *Wallis*, 202 F.3d at 1138.

(2)     In so doing, the officer must consider all relevant factors, including the desires of the parents, their fitness, the risks of treatment compared with the risks of foregoing treatment, how soon the harm will occur, whether there is time to contact a judge, and any other factors given the circumstances.

(3)     This balancing test may not be ignored simply because a doctor recommends the emergency treatment.

(3)     Both parents are entitled to pre-deprivation notice (that the officer is considering whether to deprive them of the custody of their child without a court hearing) unless there is some overriding justification for dispensing with such notice, such as emergency medical time constraints, the unavailability of a parent or parents, a reasonable belief that notice may pose a danger to the child, or similar reasons.

**Memorandum Decision and Order – Page 33**

(5)     If the officer finds the child in imminent danger, and turns the child over to the Idaho Department of Health and Welfare, the State has authority to consent to only that medical treatment that is necessary to avoid the imminent danger to the child found by the officer.  *Wallis*, 202 F.3d at 1138.

(8)     Both parents are entitled to immediate post-deprivation notice along the same lines as the requirement for pre-deprivation notice discussed above.

(9)     The State must ensure that the duration of the seizure of the child (*i.e.*, the child's stay in the hospital or other medical facility), be strictly limited to accomplish the purposes of the treatment that formed the basis for the imminent danger determination, and that the child be returned to the parents immediately upon the cessation of the imminent danger.

## 8.   <u>Muellers' Allegations</u>

The Muellers allege that both their substantive and procedural due process rights were violated.  These rights stand or fall together under the circumstances of this case.  If the Muellers' objection to treatment placed Taige in imminent danger of serious bodily harm, they had no constitutional right to object.  On the other hand, if the Muellers rejection of treatment did not place Taige in imminent harm, they retain their due process rights, and the State had no right to deprive them of custody and compel treatment.

**Memorandum Decision and Order – Page 34**

Having established the constitutional rights as delineated above, the Court will now proceed to determine whether the defendants violated those rights, and if so, whether they are nevertheless entitled to qualified immunity.

**9.**     **Detective Rogers**

The Muellers allege that Detective Rogers violated their constitutional rights when he transferred custody of Taige to the State, failed to give pre- or post-deprivation notice to Eric Mueller, and confined Corissa Mueller to a room after transferring custody.  Detective Rogers responds that he committed no constitutional violation, and that, even if he did, he is nevertheless entitled to qualified immunity.

The threshold question is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier,* 533 U.S. at 201.  If such a violation is established, the next question is whether the right was clearly established.  *Id*.

**10.**     **Procedural Due Process – Failure to Provide Judicial Hearing**

The Muellers argue that Detective Rogers violated their procedural due process right to a judicial hearing before he seized Taige.  More specifically, they argue first that he had plenty of time to contact a judge.

The Court disagrees, and finds questions of fact on this issue.  On the one

**Memorandum Decision and Order – Page 35**

hand, 45 minutes is a lot of time to make the one or two phone calls that would

secure judicial intervention.  While Detective Rogers considered calling the judge,

he was concerned that the wait would be too long.  But he would not be foreclosed

from doing other things while waiting – he could have continued his investigation

and formulated his own decision, among other things, while he waited.

On the other hand, Detective Rogers had to do some investigation before

calling the judge – he could not be expected to call a judge on a hunch or a whim,

uninformed about the basic facts.  He had to interview, among others, Dr.

Macdonald, Corissa Mueller, and Officers Green and Snyder.  At the same time,

the clock is ticking and Dr. Macdonald is insisting that the treatment begin.

These circumstances create issues of fact over whether Detective Rogers had

sufficient time to call a judge.

The Muellers argue next that Detective Rogers made his finding of imminent

danger without properly considering the risks of treatment.  The Muellers

recognize that Dr. Macdonald told Detective Rogers that the risk of foregoing

treatment "was less than the risk involved in not treating her."  *See Rogers' Third

Affidavit* at pp. 3-4.  But this could mean, the Muellers point out, that the risk of

death from treatment was 4.9%, since it would be less than even the 5% risk of

death from foregoing treatment described by Detective Rogers.  In other words, the

**Memorandum Decision and Order – Page 36**

risks could be close enough that Taige was not in imminent danger from the Muellers' declining treatment because all options posed risks.  It is undisputed that Detective Rogers never inquired any further into the risks of treatment.

As discussed above, the phrase "imminent danger" has a probability component.  As the risk of treatment approaches the risk of foregoing treatment, the State loses its *parens patriae* interest, and the child cannot be deemed to be in imminent danger from the parents' refusal of treatment.  At this point, the child is in danger no matter what the course of action, and that precludes State involvement.

Here, Detective Rogers never inquired into the risks of treatment after hearing they were less than the risks of foregoing treatment.  He had no idea whether the two risks were similar enough that he should ignore Dr. Macdonald's advice.

At the same time, however, Detective Rogers was receiving pressure from Dr. Macdonald to begin the treatments.  Dr. Macdonald was insisting that (1) the treatment needed to be done, (2) the treatment was called for by the  standard of care, (3) the treatment needed to be done quickly, (4) the risk was not just of injury

but of death,[8] and (5) the risk would be completely eliminated by the treatment.

Generally, whether Detective Rogers had reasonable cause to believe that Taige was in imminent danger is a question of fact for the jury. *Wallis,* 202 F.3d at 1138. Given all the circumstances in this case, the Court finds that questions of fact exist on this issue.[9]

## 11.   **Procedural Due Process – Notice To Eric Mueller**

The Court turns next to the lack of any notice to Eric Mueller. Eric was ignored twice by Detective Rogers. First, Detective Rogers never notified him that the police were considering depriving him of custody of his daughter – that is, Eric never received any official pre-deprivation notice. Second, Detective Rogers never notified him that the police had in fact deprived him of custody of his daughter – that is, he never received official post-deprivation notice.

This Court held above that Eric was entitled to both pre- and post-deprivation notice and that it was Detective Rogers' burden to justify why notice

---

[8] For the purpose of this argument only, the Muellers concede that the risk is a 5% risk of death.

[9] The Muellers' also argue that the imminent danger finding was improper because, assuming *arguendo* that Detective Rogers was told Taige had a 5% risk of death, a 5% risk of death is so minuscule that, as a matter of law, it cannot support a finding of imminent danger. *See Muellers' Brief* at p. 11. As discussed above, numerical "lines in the sand" ignore the balancing nature of the constitutional test. The Court refuses to find that a 5% risk of death is too small a risk, as a matter of law, to support an imminent danger finding.

**Memorandum Decision and Order – Page 38**

was not provided.  Here, Detective Rogers cites time constraints as the main reason he did not contact Eric.

However, those constraints do not rebut three crucial facts: (1) Eric was at all times available by phone, at his home; (2) Detective Rogers could have easily obtained Eric's number from Corissa and, within a minute or so, placed a call to him; and (3) There is absolutely no evidence that providing notice to Eric would pose any danger to Taige.

Under these circumstances, Detective Rogers violated Eric Mueller's procedural due process right to be provided with pre-deprivation notice that Detective Rogers was considering whether to seize Taige and compel her to undergo medical treatment.

With regard to post-deprivation notice, Detective Rogers has offered no justification for failing to immediately notify Eric that he had seized Taige and turned her over to the State for the purpose of compelling her to undergo medical treatment.  At this point, Eric's constitutional rights were "compelling" under *Wallis*.  He was entitled to post-deprivation notice so that if something goes wrong in the treatment, or if questions arise that can only be answered by him, he will be available.

There is no question that (1) Eric could have been called within minutes, (2)

**Memorandum Decision and Order – Page 39**

that he was close by and hence notice would not have been a wasted effort to notify someone who could not get to the hospital in any event, (3) that notice would not pose any danger to Taige, and (4) that Detective Rogers was aware that treatments on Taige would begin immediately.  Moreover, Detective Rogers was not letting Corissa telephone Eric while she was confined in the waiting room, making it all the more imperative that Detective Rogers notify Eric.

Given these circumstances, the Court finds as a matter of law that Detective Rogers violated Eric Mueller's procedural due process rights by failing to give him pre- and post-deprivation notice.

## 12.    <u>Substantive Due Process – Interference With Parental Rights</u>

Given that there are questions of fact as to whether Detective Rogers had reasonable cause to believe that Taige was in imminent danger, there are similarly questions of fact whether he interfered with the Muellers' parental rights.  If the Court cannot hold, as a matter of law, that the Mueller's rejection of treatment placed Taige in imminent danger, the Court cannot hold, as a matter of law, that no reasonable parent would decline treatment.  Thus, the Court must deny Detective Rogers' motion for summary judgment on this issue.  These same issues preclude summary judgment for the Muellers.

## 13.    <u>Confinement of Corissa</u>

Corissa claims that she was unconstitutionally confined by Detective Rogers after he made the imminent danger finding.  The Fourth Amendment is a guarantee against unreasonable seizures.  *U.S. v. Sharpe*, 470 U.S. 675 (1985).  Usually, Fourth Amendment reasonableness means that a search or seizure must be supported by probable cause, though pat-downs and similar minor intrusions need only be supported by reasonable suspicion. See *Terry v. Ohio*, 392 U.S. 1 (1968).

However, these requirements are relaxed when "special needs, beyond the normal need for law enforcement," make an insistence on the otherwise applicable level of suspicion  "impracticable."  *U.S. v. Scott*, 450 F.3d 863 (9th Cir. 2006).  In special needs cases, the Court dispenses with the probable cause and warrant requirements and simply applies a balancing test to determine if the seizure is reasonable.  *Yin v. State of Cal.*, 95 F.3d 864, 869 (9th Cir. 1996).  To apply the special needs exception, the seizure must have "an objective distinct from the ordinary evidence gathering associated with crime investigation."  *MacWade v. Kelly*, 460 F.3d 260, 268 (2nd Cir. 2006).  That is the case here.  Whatever seizure of Corissa occurred, its purpose was distinct from the ordinary evidence gathering associated with criminal investigations.

Under that balancing test, the Court balances the intrusion of the seizure against the governmental need for the seizure.  *See Samson v. California*, 126 S.

**Memorandum Decision and Order – Page 41**

Ct. 2193, 2197 (2006).[10]  In this case, the Officers had to ensure order in a hospital.

They also had to ensure that Taige's treatment was not interrupted.

Regardless of whether Corissa was screaming or hysterical, she admits that

she was upset and emotional.  Regardless of whether she actually tried to get into

Taige's exam room, Detective Rogers was reasonable in believing she might try to

do so.

To maintain order in the hospital, and to ensure that Taige's treatment was

not interrupted, the Officers confined Corissa for, according to her deposition

testimony, about 30 to 45 minutes.  This confinement was an intrusion on Corissa's

rights, but it was justified by the need to maintain order in the hospital and protect

the treatment of a patient.  *See generally DeLuna v. City of Rockford*, 2004 WL

2901017 (N.D. Ill. 2004)(temporary detention was reasonable "considering the

need to conduct interviews . . . in a location removed from the emotionally charged

atmosphere of the home or the hospital").

For these reasons, the Court finds as a matter of law that Detective Rogers

did not violate Corissa Mueller's Fourth Amendment rights by confining her in the

room after declaring Taige in imminent danger.

---

[10]  While the special needs exception originally was applied to search issues, it has also been applied to seizures.  *Illinois v. Lidster* 540 U.S. 419 (2004) *;Nicholas v. Goord*, 430 F.3d 652, 663 n. 21 (2nd Cir. 2005)(observing the search/seizure distinction and holding that *Lidster* applies the special needs exception to seizure cases).

**Memorandum Decision and Order – Page 42**

14.   __Qualified Immunity Analysis – Detective Rogers__

Qualified immunity shields officers from suit when they make a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances they confronted.  *Brosseau v. Haugen*, 125 S.Ct. 596, 599 (2004).  Because the focus is on whether the officers had fair notice that their conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  *Id.*  "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."  *Id.*  It is important to emphasize that this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.*

The issue here is whether the law was clearly established that Detective Rogers (1) should have secured a judicial hearing for the Muellers before seizing Taige, (2) should not have seized Taige, (3) should not have confined Corissa after seizing Taige; and (4) should have provided pre- and post-deprivation notice to Eric Mueller.

If Detective Rogers violated the Muellers' constitutional rights in the first three of these areas, he did so as a result of reasonably misapprehending laws that were not clearly established.  While the Court has defined above the course of

**Memorandum Decision and Order – Page 43**

action he should have taken, that course of action was not clearly established at the time he had to make his decisions.  The Court's research, and the parties' briefing, do not reveal any cases which have laid out the constitutional guidelines for resolving parental objections to medical treatment as this Court has done above, in the section of this decision entitled "Summary of Constitutional Rights."

This lack of clearly established law is most apparent in Detective Rogers' imminent danger analysis.  He was confronted with a physician insisting (1) that the treatments be done, (2) that they be done quickly, (3) that they constituted the standard of care, (4) that the risk of foregoing treatments outweighed the risks of treatment, (5) that the treatments would completely eliminate any danger to Taige, and (6) that if Corissa left with Taige untreated, Taige's condition could deteriorate so quickly that she could suffer serious injury or die before Corissa could return to the hospital.

In this situation, no clearly established law existed to guide Detective Rogers.  The phrase "imminent danger" has not been given any detailed definition, either by *Wallis* or any other case, that could have guided Detective Rogers. While this Court has defined the phrase to include both time and probability components, no authority had so defined the phrase at the time Detective Rogers had to make his decision.

**Memorandum Decision and Order – Page 44**

These six factors warrant application of qualified immunity even if jurors believe Dr. Macdonald that he told Detective Rogers that the risk was a 5% risk of *serious bacterial infection* rather than a risk *of death*.  The six factors must be taken into account in evaluating Detective Rogers' qualified immunity claim. *Broussau*, 125 S.Ct. at 599.  There was no clearly established law to guide Detective Rogers under the specific circumstances he faced in making his imminent danger decision.

Even if Detective Rogers made a mistake in confining Corissa, it was the result of reasonably misapprehending laws that were not clearly established. Whether Corissa Mueller was screaming and hysterical or not, she admits that she was emotional.  Whether she actually tried to get back into the exam room or not, it was reasonable for Detective Rogers to assume she might try.  He had a duty to ensure that Taige's treatment was not interrupted and that order was maintained in the hospital.  Given all these circumstances, the Court finds that Detective Rogers has qualified immunity for any mistake he made in confining Corissa.

However, Detective Rogers is not entitled to qualified immunity for his deprivation of Eric Mueller's procedural due process right to pre- and post-deprivation notice.  Those rights were clearly established in the *Wallis* case, decided in 2000, about two years before the incidents here.  That case clearly set

**Memorandum Decision and Order – Page 45**

forth the rights of parents to receive both pre- and post-deprivation notice.  Hence, the Muellers are entitled to summary judgment that Detective Rogers (1) violated Eric Mueller's procedural due process rights to pre- and post-deprivation notice, and (2) is not entitled to qualified immunity for that deprivation.

For all of these reasons, the Court will grant summary judgment to Detective Rogers on all claims except the notice claim.  As to that claim, the Court will grant summary judgment to the Muellers.

**15.**   **Officers Snyder & Green**

Officers Snyder and Green were not the ones who declared Taige in imminent danger – that was a decision made entirely by Detective Rogers.  He testified that "[w]hile they provided me with some information, neither Officers Snyder and Green, nor anyone from the [State] had any control regarding my decision to declare Taige Mueller in imminent danger."  *See Rogers Affidavit* at ¶ 45, p. 7.  Thus, the Muellers' claims that Officers Snyder and Green violated their due process rights in seizing Taige are subject to summary judgment.

If their confinement of Corissa was a mistake, it was the result of reasonably misapprehending laws that were not clearly established.  The Officers had a duty to maintain order in the hospital and to keep Corissa from interrupting the treatment of Taige.  As discussed, they had a reasonable cause to believe that Corissa may

**Memorandum Decision and Order – Page 46**

attempt to interrupt Taige's treatment, and by Corissa's own testimony, she was emotional. There was no clearly established law at that time holding that the Officers should not take Corissa to a room for 30 minutes to calm her down in order to maintain order in the hospital and prevent any interruption of patient care.

The Court has examined the entire conduct of the Officers and cannot find any part of it that is not protected by qualified immunity. The Court will therefore grant that part of the City defendants' motion seeking summary judgment on behalf of Offices Snyder and Green.

## 16.   State Defendants

Both sides seek rulings on whether the State defendants violated the Muellers' constitutional rights by (1) ordering medical care for Taige; (2) failing to give Eric Mueller custodial control over his daughter; (3) failing to give Eric an opportunity to be with his daughter during the medical treatment that they ordered; and (4) failing to return Taige to her parents when it was virtually certain that she was not very sick.

With regard to the first point, the Muellers cite no authority that the State defendants had a duty to independently review Detective Rogers' imminent danger finding. Once Detective Rogers turned Taige over to the State, the State officials were entitled to rely on his imminent danger decision. Thus, the State cannot be

liable for any errors made by Detective Rogers in declaring Taige in imminent danger.

The State did have a duty, as discussed above, to limit its consent to treatment for Taige to only that treatment needed to protect her from the imminent danger found by Detective Rogers.  That imminent danger finding compelled two treatments – a spinal tap and the administration of antibiotics – and consequently, the State's consent power was limited to those two treatments.

However, Dr. Macdonald testified that he understood April Auker to give him consent to do whatever he thought was appropriate to treat the child.  *See Macdonald Deposition* at p. 222.  He not only performed the two treatments that formed the basis for Detective Rogers' imminent danger finding, he also administered steroids to Taige.  The State defendants do not point to any evidence that administration of steroids was even suggested to the Muellers or that it played any role in the determination that Taige was in imminent danger.  Construing these facts in favor of the Muellers, a reasonable juror could conclude that the State's consent for Taige's treatment was too broad and violated the Muellers' parental rights.

The Muellers also challenge the State's conduct with regard to the duration of the seizure.  Taige was kept in the State's custody until the hearing was

completed on August 14th.  It appears that the fear that formed the basis for the imminent danger finding – the fear of serious bacterial infection – was shown to be unfounded by about 4 a.m. on the morning of April 13, 2002.  Yet Taige was kept in the hospital and not released to the Muellers until the next day's hearing.

There was no evidence whatsoever of abuse or neglect on the part of the parents.  The reason for the termination of parental rights was very limited and specific – it was the fear of serious bacterial infection.  Once that fear was proven groundless, custody of Taige should have been returned immediately to the Muellers.  Construing the facts in favor of the Muellers, a reasonable juror could conclude that their constitutional rights were violated when the State did not immediately return Taige to their custody when the danger that formed the basis for the imminent danger finding had abated.

While the State defendants violated the Muellers' constitutional rights, the State defendants are nevertheless entitled to qualified immunity for their mistakes concerning the scope of consent and the duration of the seizure.  While this Court has set firm constitutional guidelines, there was a lack of such guidelines in the law at the time of the incidents here to guide the State defendants.

The State also failed to give post-deprivation notice to Eric Mueller once Taige was turned over to them and they were preparing her for medical treatments.

**Memorandum Decision and Order – Page 49**

For the same reasons discussed in reference to Detective Rogers, the State's failure

deprived Eric Mueller of his procedural due process rights, and the State is not

entitled to qualified immunity.  The Court will accordingly grant the Muellers'

motion for summary judgment on this issue.

**17.**   **The City**

The City can be held liable under § 1983 only where it has caused the

constitutional violation at issue.  *City of Canton v. Harris*, 489 U.S. 378 (1989).

The City cannot be held liable on a *respondeat superior* theory simply because

Detective Rogers violated the Muellers' parental rights.  *Monell v. New York City*

*Dept. Of Social Serv.,* 436 U.S. 658, 691 (1978).  The Muellers must show that

there is a "direct causal link" between a City policy or practice and the

constitutional violations of Detective Rogers.  *Wallis,* 202 F.3d at 1143 (quoting

*City of Canton*, 489 U.S. at 385).[11]

The Court has held above that there are questions of fact concerning whether

Detective Rogers violated the Mueller's parental rights by not securing a judicial

hearing pursuant to Idaho Code § 16-1616 before seizing Taige.  The Court held

that the language of Idaho Code § 16-1616 would authorize Detective Rogers to

---

[11]   The City does not share in the qualified immunity that the Court has found applies to others.  *Chew v. Gates*, 27 F.3d 1432, 1438-39 (9th Cir.1994).

call a judge, but that a genuine issue of fact was raised over whether he was constitutionally compelled to do so.

If a jury found that Detective Rogers violated the Muellers' parental rights by failing to seek a judicial resolution, the City would be liable only if there was a direct causal link between a City policy and Detective Rogers' failure to use Idaho Code § 16-1616 to call a judge.  On that issue, Michael Majors, a Lieutenant with the City police who supervises Detective Rogers, testified that the City police do not use Idaho Code § 16-1616 because in their opinion, the statute is "not directed to law enforcement."  *See Majors Deposition* at p. 78.  That explains why the City's Standard Operating Procedure #45 – setting forth police procedures for imminent danger cases – does not include any reference to Idaho Code §16-1616 or the option of seeking a judicial resolution.  Under that Procedure, the police make the decision, not a judge.  To confirm this policy, Judge Day testified that he had no recollection of a police officer ever calling him directly under Idaho Code § 16-1616.  *See Day Deposition* at p. 82.

Nevertheless, Lieutenant Majors also testified that "detectives are also trained to evaluate whether there is time to obtain a court order prior to making a decision whether to declare imminent danger."  *See Majors Second Affidavit* at ¶ 5, p. 2.  Detective Rogers testified that he did consider whether he had time to call the

on-call prosecutor who would then contact the judge.  *See Rogers Third Affidavit* at ¶ 2, p. 2.  He concluded that the process would take too long.  *Id.*

This evidence raises two questions.  First, what is the City's policy?  Second, did that policy cause Detective Rogers to fail to seek judicial resolution of the imminent danger question?

With regard to the first question, there is evidence that the City's policy is that police, not judges, should make the imminent danger decision.  The City's Standard Operating Procedure #45 says nothing about seeking judicial resolution either directly or through an on-call prosecutor.  On the other hand, there is evidence that the police are trained to telephone the on-call prosecutor to seek judicial resolution if there is time to do so.  Detective Rogers was apparently so trained because he testified that he considered calling the on-call prosecutor.  *Id.*

Even if the policy was that officers, not judges, should make the decision, there are questions whether Detective Rogers was following that policy in not seeking judicial resolution. He has testified that he decided not to contact a judge (through the on-call prosecutor) because he lacked time, not because he lacked authority to do so due to the City policy.  *See Rogers Third Affidavit* at ¶ 2, p. 2.  Nevertheless, his decision may have been influenced in part by a City policy discouraging the police to contact judges directly – while 45 minutes may not be

**Memorandum Decision and Order – Page 52**

enough time to call a prosecutor who must in turn call a judge, it may be ample to call a judge directly, an issue of fact, as the Court held above.

At any rate, this conflicting evidence creates genuine issues of material fact that preclude the issuance of a summary judgment on the City's liability for any deprivation of the Muellers' parental rights caused by Detective Rogers failure to seek judicial resolution of the imminent danger issue. The Court turns next to a second policy that may be to blame for a constitutional deprivation in this case.

The Court has held above that Detective Rogers deprived Eric Mueller of his constitutional right of pre- and post-deprivation notice. There is testimony from both Detective Rogers and Lieutenant Majors that there was a City practice of dealing only with the parent who was present on the scene. *See e.g., Majors Deposition* at p. 86. On the other hand, Detective Rogers has testified that he did consider calling Eric but decided against it in part because there was no time. *See Rogers Second Affidavit* at p. 3.

The evidence is therefore not clear whether Detective Rogers' failure to give Eric notice was "directly caused" by a City policy or time constraints. This question of fact precludes summary judgment on this issue.

The Muellers also allege that the City had a policy of using the "best interests of the child" as the standard for removal rather than the "imminent

danger" standard.  The Court disagrees.  The Court finds nothing in the record to

support this.  The only reasonable interpretation of the record is that the City was

using the imminent danger standard – the proper standard – at all times.

## 18.   Motion to Exclude Dr Shapiro

Dr. Macdonald has moved to exclude certain testimony of Dr. Shapiro, the

Muellers' expert.  Dr. Shapiro is board certified in both pediatrics and pediatric

infectious diseases.  He is a Professor of Pediatrics at Yale University and

previously was the Director of a pediatric emergency room at the Yale-New Haven

Hospital.

The motion seeks to exclude a broad range of Dr. Shapiro's expected

testimony.  However, the Court need not resolve at this time much of what the

motion challenges because the Court is not relying on that testimony in this

decision.  Accordingly, the Court will only evaluate that testimony that the Court

will examine to resolve these motions.  The parties remain free to re-raise their

broader challenges to Dr. Shapiro's testimony either through motions in limine or

at trial.[12]

The crucial testimony of Dr. Shapiro that relates to the pending motions is

---

[12] For example, Dr. Macdonald challenges testimony by Dr. Shapiro that Taige was in "imminent danger."  The Court has not relied on this testimony in any way in resolving the pending motions and so will not resolve this challenge now.  Dr. Macdonald is free to re-raise this objection at some later point.

**Memorandum Decision and Order – Page 54**

his testimony that no reasonable physician could have believed to be true the statement that an infant with Taige Muellers' symptoms had a 5% chance of dying or suffering irreversible brain damage. *See Dr. Shapiro's Expert Report* at p. 3. Such a statement, in Dr. Shapiro's opinion, would be "grossly misleading." *Id*. at p. 6. He "would estimate that Taige Mueller's chances of having a life-threatening disease were about 0.4%, and in any event, they were well below 1%." *Id*. at p. 5.

Dr. Macdonald argues that this testimony should be excluded because Dr. Shapiro has no knowledge of the local standard of care. Dr. Macdonald points out that it is undisputed that the local standard of care requires that infants with Taige's symptoms be treated with a lumbar puncture and antibiotics. He asserts that his knowledge of this local standard is directly relevant to his reasonable beliefs "regarding the *necessity of such treatment* or *the risks posed to Taige*." *See Dr. Macdonald's Reply Brief* at p. 5 (emphasis added).

It is the latter, not the former, that is implicated by Dr. Shapiro's testimony that the Court is focused on here. In other words, the Court is only concerned at this point with determining the role played by the local standard of care in determining the *risks posed to Taige,* not the *necessity of treatment.*

Dr. Macdonald has not pointed the Court to any evidence in the record that familiarity with the local standard of care would lead one to believe that Taige had

**Memorandum Decision and Order – Page 55**

a 5% risk of death.  The record contains nothing equating the local standard of care

with any specific percentage assessment of risk.  Consequently, Dr. Shapiro's lack

of familiarity with the local standard of care does not disqualify him from

testifying that no physician could truthfully say that Taige had a 5% risk of death.

Moreover, the local standard of care is irrelevant here.  The question is what

risks were faced by Taige.  That is a statistical computation, not an inquiry into the

nature of local practice.

To this degree, the Court will deny Dr. Macdonald's motion to exclude.  As

stated, Dr. Macdonald is free to raise later all the grounds he raised in this motion

that were not resolved, as well as other appropriate grounds.

### 19.   <u>Dr. Macdonald</u>

In order to prevail on their § 1983 conspiracy claim against Dr. Macdonald,

the Muellers must show that (1) he was part of a conspiracy to deprive them of

their constitutional rights, and (2) in so doing, he acted under color of state law.

*Jensen v. Lane County*, 222 F.3d 570, 575 (9th Cir. 2000).  Evidence that a state

actor relied on a private party and failed to exercise independent judgment will

support an inference of conspiracy.  *United Steelworkers of America v. Phelps*

*Dodge Corp*., 865 F.2d 1539, 1541 (9th Cir. 1989).  A private party like Dr.

Macdonald is acting under color of state law when "he participates in a

**Memorandum Decision and Order – Page 56**

governmental act and there is a sufficiently close nexus between the state and the

private actor so that the action of the latter may be fairly treated as that of the state

itself." *Jensen v. Lane County*, 222 F.3d 570, 575 (9th Cir. 2000).  This is generally

a factual issue that should be resolved by the jury.  *Mendocino Environmental*

*Center v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999).

The central accusation against Dr. Macdonald is that he misled Detective

Rogers to believe that Taige faced a 5% risk of death in an effort to use Detective

Rogers' statutory authority to deprive the Muellers of custody of Taige.  Crucial

questions of fact are raised on this claim by the testimony of two men.  First,

Detective Rogers' testimony – consistent with what he told Officers Snyder and

Green on the belt tape – raises a question of fact whether Dr. Macdonald told him

that Taige faced a 5% risk of death.  Second, Dr. Shapiro's testimony raises a

question of fact whether Dr. Macdonald could have reasonably believed that Taige

suffered a 5% risk of death.

If Dr. Macdonald knowingly exaggerated Taige's risk, that is substantial

evidence supporting the Muellers' assertion that he was using Detective Rogers'

authority to deprive them of their parental rights.  Dr. Macdonald responds,

however, that he is immunized from liability by Idaho Code § 16-1606.  That

statute states that "any person who has reason to believe that a child has been

**Memorandum Decision and Order – Page 57**

abused, abandoned, or neglected and, acting upon that belief, makes a report as required in section 16-1605, Idaho Code, shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed." The only exception is when the report is "in bad faith, with malice, or with knowledge of falsity." *See* I.C. § 16-1607.

For § 1983 purposes, a physician cannot become a state actor by complying with a legal duty to report suspected child abuse or neglect. *See e.g., Brown v. Newberger*, 291 F.3d 81, 93 (1st Cir. 2002); *Preston v. New York*, 223 F.Supp.2d 452, 466 (S.D.N.Y 2002) (holding that private actors do not become state actors simply by complying with legal duty to report suspected child abuse). Thus, Dr. Macdonald did not become a state actor simply because he reported the Muellers to Robert Condon, the Hospital's social worker.

However, if Dr. Macdonald made his report "with knowledge of falsity," he no longer is entitled to immunity. As discussed above, there are questions of fact as to whether Dr. Macdonald falsely exaggerated the risk to Taige in an effort to use Detective Rogers' statutory authority to deprive the Muellers of their parental rights. If the jury so finds, Dr. Macdonald is not entitled to the immunity provided by Idaho Code § 16-1606.

As to all other claims against Dr. Macdonald, they depend entirely on jurors

adopting Detective Rogers' version of Dr. Macdonald's risk assessment and Dr. Shapiro's opinion about what that means.  On the other hand, if the jurors adopt Dr. Macdonald's version of the risk assessment, he has no liability.  In that situation, there is no evidence that his risk assessment was unreasonable.  Dr. Shapiro testified that it would not be "wildly inaccurate" to say that Taige had a 5% risk of having a serious bacterial infection.  *See Dr. Shapiro's Rebuttal Expert Report* at p. 9.  As discussed previously, Dr. Womack testified that the risk of having a serious bacterial infection was between 1% and 8%.  There is no evidence in this record rendering unreasonable an assessment that Taige had a 5% risk of serious bacterial infection.

Consequently, there would be no evidence that Dr. Macdonald misled Detective Rogers if the jury believes Dr. Macdonald that he told Detective Rogers that Taige had a 5% risk of a serious bacterial infection.  Rather, the evidence would be simply that Dr. Macdonald was (1) reasonably assessing the risk, and (2) following the local standard of care, deviation from which would expose him to a malpractice action.  In this situation, all of the Muellers' state law claims would fall.

In addition, under this scenario, Dr. Macdonald would be entitled to rely on Detective Rogers' "imminent danger" finding, and could participate at Detective

Rogers' direction in obtaining physical custody of Taige.  While the Court has found that Detective Rogers may have committed constitutional violations, there is no way Dr. Macdonald could have known about them, and he did not participate in them in any way if the jury believes his version of his risk assessment.

The same analysis applies to Auker's consent.  While her broad consent may have violated the Muellers' constitutional rights, there is no way that Dr. Macdonald could have known this, and he was entitled to rely upon Auker's consent.

However, given that there are questions of fact concerning Dr. Macdonald's risk assessment, the Court cannot grant summary judgment for Dr. Macdonald. However, the above analysis will guide the parties at trial.

## 20.   <u>**Summary**</u>

The defendants violated some of the Muellers' constitutional rights as a matter of law.  Detective Rogers violated their rights by failing to give pre- and post-deprivation notice to Eric Mueller.  The State defendants violated the Muellers' rights by (1) failing to give post-deprivation notice to Eric Mueller, (2) communicating too broad a consent to treatment of Taige Mueller, and (3) holding Taige too long after the imminent danger had abated.

With regard to other rights held by the Muellers, the Court finds questions of

fact.  More specifically, there are questions of fact over whether Detective Rogers violated the Muellers' due process rights by declaring that Taige was in imminent danger from the Muellers' refusal to agree to have her undergo medical treatment.

These defendants are protected to some degree by the doctrine of qualified immunity even if they did violate the Muellers' constitutional rights.  In this case, the State defendants are entitled to qualified immunity for all claims except the deprivation of Eric Mueller's post-deprivation notice.  Detective Rogers is entitled to qualified immunity for all claims against him except the claims that he failed to give pre- and post-deprivation notice to Eric Mueller.  On the notice claims, the Court grants summary judgment to the Muellers.

With regard to the City, there are questions whether the City had a policy that caused Detective Rogers to (1) fail to secure a judicial hearing before depriving the Muellers' of the custody of their daughter, and (2) fail to give pre- and post-deprivation notice to Eric Mueller.  With regard to Dr. Macdonald, there are questions whether he told Detective Rogers that Taige had a 5% risk of death or a 5% risk of serious bacterial infection.  If it is the former, that finding may be grounds a reasonable juror could conclude, depending on how the testimony of Dr. Shapiro is evaluated and other factors, that Dr. Macdonald exaggerated the risk to Taige in order to use Detective Rogers' statutory authority to secure medical

treatments for Taige.  These issues remain for trial before a jury.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions for summary judgment (Docket Nos. 209, 219, 224, 225 and 227) are GRANTED IN PART AND DENIED IN PART as explained above.

IT IS FURTHER ORDERED, that the motion to exclude Dr. Shapiro's testimony (Docket No. 226) is DENIED without prejudice to the rights of Dr. MacDonald to re-raise the issues not resolved in this decision.

IT IS FURTHER ORDERED, that the motion to exclude the testimony of John Sullivan (Docket No. 223) is DEEMED MOOT as the Court did not consider that testimony.


DATED:  **February 26, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge


**Memorandum Decision and Order – Page 62**