Kirtlan G. Naylor    [ISB No. 3569]
Bruce J. Castleton    [ISB No. 6915]
NAYLOR & HALES, P.C.
Attorneys at Law
950 W. Bannock Street, Suite 610
Boise, Idaho 83702
Telephone No. (208) 383-9511
Facsimile No. (208) 383-9516
Email: kirt@naylorhales.com; bjc@naylorhales.com

Attorneys for Defendants City of Boise, Dale Rogers,
Ted Snyder and Tim Green

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| ERIC MUELLER and CORISSA D. MUELLER, husband and wife, individually, and on behalf of TAIGE L. MUELLER, a minor, and on behalf of themselves and those similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>APRIL K. AUKER, KIMBERLY A. OSADCHUK, JANET A. FLETCHER, BARBARA HAMON, LINDA RODENBAUGH, KARL B. KURTZ, KEN DIEBERT, THE CITY OF BOISE, DALE ROGERS, TED SNYDER, TIM GREEN, RICHARD K. MacDONALD, and ST. LUKE'S REGIONAL MEDICAL CENTER,<br><br>      Defendants. | Case No. CIV 04-399-S-BLW<br><br>**DEFENDANT BOISE CITY'S TRIAL BRIEF** |

**TRIAL BRIEF - 1.**

Defendant Boise City, by and through its attorneys of record, the law firm of Naylor & Hales, P.C., hereby submits its Trial Brief in anticipation of the jury trial schedule for this case beginning June 7, 2010.

## I.
## PERTINENT FACTUAL BACKGROUND

On August 12, 2002, Corissa Mueller's five-week-old infant, Taige Mueller, developed a fever. Corissa Mueller became increasingly more concerned when her daughter's temperature rose from roughly 99 degrees at 8:00 p.m. to 100.8 degrees by around 9:00 p.m. *Memorandum Decision* (Dkt. 282) at 2. Corissa Mueller called Dr. Karen Erickson, a naturopathic physician, and explained that her daughter had not nursed well that day and that her temperature was rising. *Mueller v. Auker*, 576 F.3d 979, 983 (9th Cir. 2009). In light of Taige's extremely young age, her elevated temperature, and her poor appetite, Dr. Erickson recommended that Corissa Mueller have the infant examined at the hospital. *Id*. Dr. Erickson, who had no hospital privileges, informed Corissa Mueller that if she took Taige to the emergency room, doctors would likely want to conduct a chest x-ray, urinalysis, and blood test. *Id*. She also stated that physicians would "automatically start her on an antibiotic regiment and perform a spinal tap" in order to check for meningitis. *Memorandum Decision* (Dkt. 282) at 3.

Corissa Mueller discussed Dr. Erickson's recommendations with her husband, Eric. Although the Muellers had reservations about the spinal tap and the administration of antibiotics, they agreed with Dr. Erickson's assessment that taking Taige to the emergency room "would be the safe thing to do." *Mueller*, 576 F.3d at 983.

**TRIAL BRIEF - 2.**

Corissa Mueller arrived with Taige at the emergency room at St. Luke's Hospital at around 10:00 p.m. Eric Mueller remained at home with their son. *Id*. Upon her admittance to the emergency room, Taige was examined by Dr. Richard Macdonald. Upon examining the infant, Dr. Macdonald was immediately concerned. Dr. Macdonald observed that Taige had a temperature of 101.3, appeared ill, and was both lethargic and fussy. *Id*. He also noticed that she had a delayed capillary refill and a slight rash. *Id*. Concerned that Taige may have meningitis or another serious bacterial infection, Dr. Macdonald recommended that Taige begin an antibiotic regimen and that she also undergo a full septic work-up, which included various lab tests and a spinal tap. *Id*. The spinal tap would take fluid from Taige's spinal column to determine if she had meningitis. *Memorandum Decision* (Dkt. 282) at 3. Dr. Macdonald emphasized that time was of the essence to perform the spinal tap and administer the antibiotics because "these babies can go from bad to worse very quickly." *Id.*

Despite Dr. Macdonald's emphatic warnings, Corissa Mueller refused to allow her infant child to receive antibiotics or undergo a spinal tap. *Id*. Although she has no medical training, Corissa Mueller ignored Dr. Macdonald's recommendations in favor of her own Internet research. *Mueller*, 576 F.3d at 983. She believed that the risks associated with administering antibiotics and performing a spinal tap outweighed the probability that Taige had meningitis. *Memorandum Decision* (Dkt. 282) at 4. As a result, she only consented to the lab tests. *Id*.

The lab tests became available around 11:00 p.m. The results ruled out a urinary tract infection and ear infection, but they did not rule out meningitis. *Mueller*, 576 F.3d at 983. Corissa Mueller understood that the only way to rule out meningitis was to perform a spinal tap. *Id*. However, at that point, Taige had received intravenous fluids, her temperature had fallen to 98.9

**TRIAL BRIEF - 3.**

degrees, and she began to nurse again. *Memorandum Decision* (Dkt. 282) at 4. Nonetheless, Dr. Macdonald again tried to convince Corissa Mueller to consent to the spinal tap. Corissa Mueller determined that because her daughter was doing better, there was no reason to consent to the spinal tap. *Mueller*, 576 F.3d at 985. She therefore denied permission to the doctors to perform any further diagnostic steps. She also rejected Dr. Macdonald's offer to obtain a second medical opinion regarding the spinal tap. *Memorandum Decision* (Dkt. 282) at  *Mueller ex rel. Mueller*, 2007 WL627620 at 10.

In response to Corissa Meuller's refusal to consent to the recommended procedures, Dr. Macdonald consulted with Dr. Noreen Womack, a board-certified pediatrician. *Memorandum Decision* (Dkt. 282) at 4-5. She agreed that for five-week-old infants with Taige's symptoms the standard of care was to perform a spinal tap and administer antibiotics. *Memorandum Decision* (Dkt. 282) at 5. Dr. Womack recommended that Dr. Macdonald contact a social worker if Corissa Mueller continued to refuse to consent to her daughter's treatment. *Id*.

When Corissa Mueller again refused to consent to the recommended treatment, Dr. Macdonald contacted hospital social worker, Bob Condon, and apprised him of the situation. *Id*. Pursuant to hospital policy, Condon stated that he was required to contact both the Child Protective Services ("CPS"), a division of the Idaho Department of Health and Welfare, and law enforcement officers. *Id*. At 11:39 p.m., Condon called April Auker, the on-call Risk Assessment Worker for CPS. He also contacted police officers Ted Snyder and Tim Green, who were present at the hospital. *Id.*

**TRIAL BRIEF - 4.**

Just after midnight on August 13, 2002, Dr. Macdonald spoke with Auker, Officer Snyder, and Officer Green about Tiage Mueller's medical condition. Officer Synder recorded the conversation on his belt recorder. During the conversation, Dr. Macdonald explains:

> [I]f I took a hundred kids with the same presentation probably 95 percent of them would end up having just some viral illness, will get better in a couple of days, would be fine. I know that about 5 out of those 100 if I let them go home will die. Will die of meningitis . . . if I practice medicine the way [Corissa Mueller] is wanting me to practice it, I would . . . I'd lose five out of a hundred kids. See what I'm saying?

*Mueller*, 576 F.3d at 984. Additionally, Dr. Macdonald explained to Auker that it was important that Taige be treated within a three-hour time frame. *Id*.

Officers Snyder and Green contracted their superior, Detective Dale Rogers, and requested that he come to the hospital. Detective Rogers arrived at the emergency room at approximately 1:00 a.m. and Officer Snyder briefed him on the situation. Under former I.C. § 16-1612, Detective Rogers, as a "peace officer," had the responsibility to determine whether an endangered child should be placed in "shelter care" under temporary control of the State pending a court hearing. *Id*.

Detective Rogers spoke with Dr. Macdonald. Dr. Macdonald stated that there was a five percent chance Taige Mueller had meningitis or some other life-threatening condition. *Id*. at 985. He also estimated that there was a five percent chance that Taige Mueller could die if she was not treated. *Id*. He explained that "if Taige left [the hospital] without receiving treatment, there was a chance she could become increasingly ill and die before Mrs. Mueller could return to the hospital." *Memorandum Decision* (Dkt. 282) at 9. Dr. Macdonald assured Detective Rogers that virtually all infants who obtain treatment fully recover and that any risk associated with treatment was less than

**TRIAL BRIEF - 5.**

the risk associated with foregoing it. *Id*. However, he warned that they had already used up two and hours and fifteen minutes of an already narrow "three-hour window of opportunity" to effectively treat Taige Mueller. *Id*. He therefore emphasized that treatment needed to begin very quickly. *Id*.

Following Dr. Macdonald's emphatic warning, Detective Rogers considered whether to declare Taige Mueller in "imminent danger" and allow her undergo the recommended medical procedures. Under I.C. § 16-1612, when a law enforcement officer declares a child in imminent danger and turns the child over to the State Department of Health and Welfare, the State assumes custody and can consent to medical treatment. Detective Rogers spoke with Auker and asked if CPS was prepared to take custody of Taige Mueller and, if so, whether it would consent to the treatment Dr. Macdonald was suggesting. Auker replied affirmatively. *Mueller*, 576 F.3d at 985.

Detective Rogers talked with Corissa Mueller on three separate occasions regarding Dr. Macdonald's desire to perform a spinal tap and administer antibiotics. Each time, he tried to convince her to consent to the treatment. Each time, Corissa Mueller denied consent. *Memorandum Decision* (Dkt. 282) at 10.

After her third conversation with Detective Rogers, Corissa Mueller requested that a nurse take Taige's temperature. She indicated that if the temperature was down, she wanted to begin discharge procedures. At approximately 1:40 a.m., a reexamination revealed that Taige Mueller's temperature had risen to 101 degrees. *Mueller*, 576 F.3d at 985.

In light of Taige Mueller's worsening condition combined with Dr. Macdonald's professional opinion that there was a five percent chance that the infant could die if she did not receive immediate treatment, Detective Rogers determined that Taige Mueller was in imminent

**TRIAL BRIEF - 6.**

danger. *Id*. In making that determination, the infant was temporarily turned over to State custody so that she could receive the medical treatment Dr. Macdonald recommended. *Id*.

Corissa Mueller reacted to Detective Roger's decision by hysterically "screaming and yelling." *Memorandum Decision* (Dkt. 282) at 13-14. She also resisted the attempts of Officers Snyder and Green to escort her down the hallway to a conference room so that she would not interrupt Taige's treatment. *Id*. When she began struggling and fighting to get back in the room and refused to leave, Officers Snyder and Green physically escorted her down the hall. *Id*.

At approximately 3:00 a.m., Dr. Macdonald performed the spinal tap and authorized the administration of antibiotics. *Memorandum Decision* (Dkt. 282) at 18. The spinal tap showed that Taige's spinal fluid was clear, indicating that she did not have meningitis. *Id*. Any potential medical emergency was over. Later that morning, following Taige's treatment, Corissa Mueller was reunited with her daughter, who suffered no ill-effects from the spinal tap or antibiotics. *Id*. at 18-19. On August 14, 2002, at a statutory post-deprivation hearing, the Mueller's regained custody of their infant daughter. *Id*. at 19.

On August 14, 2004, the Muellers filed a Complaint seeking relief for the events of August 12 and August 13, 2002. The Muellers filed a Second Amended Complaint on April 27, 2006, alleging claims against Detective Rogers for violating substantive and procedural constitutional rights pursuant to 42 U.S.C. § 1983. The Mueller's filed a Motion for Summary Judgment on April 20, 2006, which was supplemented with a statement of undisputed facts and supporting affidavits on May 2, 006. Detective Rogers denied all claims against him in the Second Amended Complaint. He filed a Motion for Summary Judgment against the Muellers, and included supporting affidavits, on May 15, 2006.

**TRIAL BRIEF - 7.**

On February 26, 2007, the district court granted partial summary judgment to Detective Rogers on the ground that he was shielded by qualified immunity against the Mueller's claims that his conduct violated their substantive due process parental rights. However, the court denied Detective Roger's motion for summary judgment in relation to Eric Mueller's procedural due process claims. Detective Rogers timely filed a Motion for Reconsideration, but it was denied on June 7, 2007. Thereafter, he filed a timely notice of appeal.

On August 10, 2009, the United States Court of Appeal for the Ninth Circuit reversed and remanded the district court's decision. *Mueller*, 576 F.3d 983. In so doing, the Court determined that there is a genuine issue of fact as to whether Detective Rogers was confronted with imminent danger to Taige Mueller on August 13, 2002. *Id*. at 992. The Court also determined that Detective Rogers is entitled to qualified immunity on the claim that he violated Eric Mueller's constitutional right to post-deprivation notice. *Id*. at 999. Thus, the Court remanded the case so that a factual determination could be made as to whether Detective Rogers was confronted with imminent danger when he placed Taige Mueller in the temporary custody of the state so she could receive medical treatment. *Id*. at 1000.

## II.
## REMAINING CLAIMS AGAINST THE CITY OF BOISE

In their Second Amended Complaint (Dkt. No. 215) the Plaintiffs brought several claims against the City Defendants including a claim of conspiracy to deprive Eric and Corissa Mueller of their parental rights (Count 1), deprivation of Corissa's due process rights (Count 2), conspiracy to deprive Taige of her due process rights (Count 3), and injunctive relief regarding Boise City's policies and/or practices (Count 4).

**TRIAL BRIEF - 8.**

On summary judgment this Court granted qualified immunity to Officers Snyder and Green as it related to their conduct in this case. It further granted qualified immunity to Dale Rogers on all claims except as to the Muellers' claim that he unreasonably declared imminent danger and that he failed to give pre- and post-deprivation notice to Eric Mueller. As to the City itself, this Court found a questions of fact as to whether the City had a policy that caused Rogers to fail to secure a judicial hearing before declaring imminent danger and removing Taige from the custody of her parents. This Court also granted Eric Mueller's motion for summary judgment against Rogers and the City as it related to his claim of deprivation of pre- and post-deprivation notice. *See* Dkt. No. 282, pp. 60-62.

On appeal to the Ninth Circuit, that Court reversed this Court's ruling as to the denial of qualified immunity to Rogers, holding that he was entitled to such qualified immunity on the issues imminent danger and notice given the facts established in the record and the law as it existed in August 2002. *Mueller v. Auker*, 576 F.3d 979, 998 (9th Cir. 2009). The Ninth Circuit also reversed this Court's decision granting summary judgment to Eric Mueller, holding that Eric was not entitled to pre-deprivation notice in this situation where he had allowed Corissa to assume decision-making authority for both of them where she was the parent who took Taige to the emergency room that evening. *Id.* at 996-97.

As such, on remand the only City defendant remaining in this case is the City itself. The only remaining claim against the City relates to Detective Rogers' decision to declare imminent danger–to determine that the situation merited removing Taige from her parents' custody without a judicial hearing or order. *See* Dkt. No. 282, pp. 23-27, 35-38. If the jury finds that Rogers had

**TRIAL BRIEF - 9.**

reasonable cause to declare Taige in imminent danger given the relevant factors to consider as identified in this Court's decision, then the claim against the City must be dismissed at that point.

If the jury finds Rogers did not have reasonable cause to declare Taige in imminent danger, the jury then needs to decide whether Rogers' unreasonable decision was directly caused by a custom, practice, or policy of the City under the *Monell* doctrine. *See* Dkt. No. 282, pp. 50-54. *See also* Monell *v. New York City Dept. Social Serv.*, 436 U.S. 658 (1978). If the jury resolves this issue in the negative, then the claim must be dismissed. If the jury also finds this in the affirmative, then there can be liability assessed against Boise City and the jury can then determine whether the Muellers are entitled to damages as a result of the City's conduct.

There is also the question of whether the Plaintiffs' injunctive relief claims are still viable, as discussed below.

## III.
## PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF

### A.     The Muellers' Claims for Injunctive Relief Are Moot

In their fourth cause of action the Plaintiffs allege that the City had a policy of "tak[ing] custody of children away from their parents without legal authority and under circumstances and conditions that violate those parents' constitutional rights, because the deprivation is effected without court order and in the absence of imminent harm." Second Amended Complaint, Dkt. No. 215, ¶ 71. Plaintiffs further allege that "[t]he Muellers have three children, and are expecting a fourth. They use emergency care centers for medical care. Unless defendants are enjoined, there is a reasonable likelihood that the Muellers will again be subjected to unconstitutional conduct." *Id.* at ¶ 73. And, they allege they "have been deterred from using

**TRIAL BRIEF - 10.**

emergency rooms in hospitals for the care of their children because they fear further exposure to defendants' unconstitutional policies." *Id.* at ¶ 74.

It is Boise City's understanding that the Muellers no longer live in Idaho, but now live in Hawaii. As such, their claim of normal use of emergency care centers or emergency rooms in Idaho is no longer a valid basis for this Court issuing injunctive relief. "In general a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481 (1982). The exception to this rule–cases that are deemed to be capable of repetition, yet evading review–applies only when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975). In this case the Muellers are no longer residents of Idaho, and accordingly no longer have a cognizable interest in any policy changes in Idaho that are brought about as a result of this case. Further, it is not a reasonable expectation that the Muellers would be further subjected to the same conduct complained of here, where they no longer reside in Idaho.

Further, although "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, ... [t]he case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.,* 345 U.S. 629, 632-33 (1953). In this case, not only are the Muellers no longer residents of Idaho, but since the original Complaint in this case was filed the City of Boise has changed its imminent danger policy such that officers placed in the position Dale Rogers faced on August 13, 2002 have the very guidance available to them in making that decision as this Court

**TRIAL BRIEF - 11.**

determined was proper in its Memorandum Decision, Dkt. No. 282. Boise City hereby refers to and incorporates its Motion in Limine re: Boise City Police Department Policies (filed contemporaneously) to address the changes that have been made to the imminent danger policy.

Accordingly, the issue of injunctive relief against Boise City has become a moot issue in this case for multiple reasons. The Muellers are no longer residents of Idaho and would therefore not reasonably be expected to be placed in a potential position where Idaho peace officers would be called upon to make the same imminent danger decision Rogers made on that night in August 2002. Furthermore, the very Boise City policy itself has been changed in order to more fully implement the law of this case and to effectuate the required processes and analysis this Court directed in its Memorandum Decision and Order. Given this, the Muellers' request for injunctive relief against the City has become moot.

      **B.**      **Plaintiffs' Injunctive Relief Claims Must be Considered Outside of the Jury's Presence by the Court**

"A complaint alleging a violation of 42 U.S.C. § 1983 and seeking both equitable and legal relief is entitled to have a jury determine the merits of the legal issues in the case." *Amburgey v. Cassady*, 507 F.2d 728, 730 (1974); *see also Sullivan v. School Bd. of Pinellas County*, 773 F.2d 1182, 1187 (11th Cir. 1985); *Smith v. Hampton Training School for Nurses*, 360 F.2d 577, 581 (4th Cir. 1966). Where the Muellers have made claims that are both legal and equitable in nature, a jury trial in this case is proper, but the resolution of equitable issues is reserved for the court, not the jury. Thus, Boise City asks that if this Court determines that the Muellers' injunctive relief claims are still viable, that this issue be determined by the Court outside the presence of the jury.

**TRIAL BRIEF - 12.**

## IV.
## CORISSA MUELLER'S DEPOSITION ERRATA

Following the depositions of Eric and Corissa Mueller, those parties submitted substantial changes to their deposition testimony through errata sheets in November 2005. Defendant St. Lukes thereafter moved to strike the errata changes. *See* Dkt. No. 163. This Court thereafter denied St. Luke's motion, but ruled that instead of striking the errata changes, the Defendants were entitled to, *inter alia*, "show the changes to the jury and thoroughly cover the issue in cross-examination of the Muellers." Memorandum Decision, Dkt. No. 206, p. 4.

Accordingly, Boise City hereby gives notice that it intends to fully implement the Court's direction and allowance at trial with respect to the errata changes made by Eric and Corissa Mueller in their deposition testimony.

Respectfully submitted this 27th day of April, 2010.

NAYLOR & HALES, P.C.


By /s/ Kirtlan G. Naylor, Of the Firm
E-mail: kirt@naylorhales.com
Attorneys for Defendant Boise City

**TRIAL BRIEF - 13.**

## CERTIFICATE OF SERVICE

      I hereby certify that on the 27th day of April, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

      **John L. Runft,** Attorneys for Plaintiffs
      jlrunft@runftsteele.com

      **Jon M. Steele**, Attorney for Plaintiffs
      jmsteele@runftlaw.com

      **Michael E. Rosman,** Attorney for Plaintiffs
      rosman@cir-usa.org

      **Christopher J. Hajec**, Attorney for Plaintiffs
      hajec@cir-usa.org

      **Richard E. Hall,** Attorneys for Defendant Macdonald
      reh@hallfarley.com

      **W. Marcus Nye,** Attorneys for Defendants Auker, Osadchuk, Fletcher, Harmon, Rodenbach
      nye@racinelaw.net

      **Scott J. Smith**, Attorneys for Defendants Auker, Osadchuk, Fletcher, Harmon, Rodenbach
      sjs@racinelaw.net

      **Patricia M. Olsson,** Attorneys for Defendant St. Luke's
      pmo@moffat.com

      **J. Walter Sinclair,** Attorneys for Defendant St. Luke's
      jwsinclair@stoel.com

      **Nicole C. Hancock,** Attorneys for Defendant St. Luke's
      nchancock@stoel.com

M:\Boise City\Mueller\Pleadings\6832_69 Trial Brief.wpd

**TRIAL BRIEF - 14.**