W. Marcus W. Nye, ISB No. 1629
Special Deputy Attorney General
RACINE, OLSON, NYE, BUDGE
     & BAILEY, CHARTERED
P. O. Box 1391/Center Plaza
Pocatello, Idaho 83204-1391
Telephone:  (208) 232-6101
Facsimile: (208) 232-6109

Attorneys for Defendants April K. Auker, Kimberly A. Osadchuk,
Janet A. Fletcher, Barbara Harmon, Linda Rodenbach, Karl B. Kurtz and Ken Diebert

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERIC MUELLER and CORISSA D. MUELLER, husband and wife, individually, and on behalf of TAIGE L. MUELLER, a minor, and on behalf of themselves and those similarly situated, | Case No. CIV 04-399-S-BLW |
| Plaintiffs, | **STATE DEFENDENTS' PRETRIAL BRIEF** |
| vs. | |
| APRIL K. AUKER, KIMBERLY A. OSADCHUK, JANET A. FLETCHER, BARBARA HAMON, LINDA RODENBACH, KARL B. KURTZ, KEN DIEBERT, THE CITY OF BOISE, DALE ROGERS, TED SNYDER, TIM GREEN, RICHARD K. MACDONALD, and ST. LUKE'S REGIONAL MEDICAL CENTER, | |
| Defendants. | |

Defendants April Auker, Kimberly Osadchuk, Janet Fletcher, Barbara Hamon, Linda Rodenbach, Karl Kurtz, and Ken Diebert (hereinafter "Health Department Employees"), by and through their attorney of record W. Marcus W. Nye of the law firm of Racine Olson Nye Budge & Bailey Chartered, hereby submits the following Pretrial Brief.

1

## INTRODUCTION

As his Court is well aware, this Plaintiffs claims in this case arise from the treatment of an illness suffered by Taige Muller on August 12, 2002.  At the time, Taige was a mere five (5) weeks old.  Corissa Mueller brought Taige to the emergency room at St. Luke's hospital where Taige was seen by Dr. MacDonald.  Because of Taige's symptoms, Dr. MacDonald believed that there was a risk that Taige was suffering from a life threatening bacterial infection such as meningitis requiring immediate testing and treatment.  Corissa Mueller refused to consent to the testing and treatment.  Boise City Police Detective Dale Rogers was called to the scene.  As authorized by I.C. § 16-1608[1], Detective Rogers declared Taige to be in imminent danger and transferred custody of Taige to the Idaho Department of Health and Welfare (hereinafter the "Health Department").  Relying upon Dr. MacDonald's advice, the Department authorized Dr. MacDonald to perform the testing and treatment.  The testing ultimately showed that Taige was not suffering from a life threatening bacterial infection but instead was suffering from a viral infection similar to the flu.

The Plaintiffs filed the present lawsuit alleging that their constitutional rights were violated by the actions of the all parties involved, including the Health Department Employees.  Although it is not entirely clear from the allegations in the Plaintiffs' Second Amended Complaint, this Court has previously determined three different actions taken by the Health Department Employees have or may have violated the Plaintiffs' constitutional rights.  First, this Court has already determined as matter of law that the scope of the authorization granted by the Health Department for the testing and treatment violated the Plaintiffs' constitutional rights.  Dkt. No. 282 at p. 60.  Second, this Court has already determined as a matter of law that duration

---

[1] For simplicity, all references to statutes in this brief are to the current versions in the code.

of time in which the Health Department retained custody of Taige exceeded what was constitutionally permissible and therefore violated the Plaintiffs' constitutional rights. *Id.* Lastly, this Court has determined that there are genuine issues of material fact to be decided at trial as to whether the Health Department satisfied Eric Mueller's constitutional right to receive notice after Taige was declared in imminent danger by Detective Rogers, which is also known as the constitutional right to post-deprivation notice. Dkt. No. 359 at pp. 3-5.

As relief for these alleged constitutional violations, the Plaintiffs initially sought both monetary damages and injunctive relief. However, this Court has already determined that the Health Department Employees are not liable for monetary damages in this case for any of these alleged constitutional violations. For example, this Court has found that the Health Department Employees are entitled to qualified immunity, which precludes an award of monetary damages. Dkt. No. 282 at p. 61. In addition, this Court has dismissed all Health Department Employees in their individual capacities, leaving them to be sued only in their official capacities, which also precludes an award of monetary damages. Dkt. No. 312 at p. 10 ("the individual State defendants are not personally liable").

Thus, for trial, the only issues to be determined with regard to the claims against the Health Department Employees is (1) whether Eric Mueller's constitutional right to post-deprivation notice was violated, and (2) whether the Plaintiffs' are entitled to injunctive relief for any of the three alleged constitutional violations.

**FACTUAL BACKGROUND**

A.      **MONDAY – AUGUST 12, 2002**

On August 12, 2002, Corissa Mueller's five-week-old infant, Taige Mueller who had

been home birthed, developed a fever. Throughout the day, Corissa Mueller consulted by

telephone with Karen Erickson, who was a naturopathic midwife who had assisted with Taige's

birth.  Corissa and the midwife grew concerned when the child's fever rose from roughly 99

degrees at 8:00 p.m. to 100.8 degrees by around 9:00 p.m. In light of Taige's age, elevated

temperature, and poor appetite, the midwife recommended that Corissa have the infant examined

by a medical doctor to rule out such conditions as an ear infection, a urinary tract infection, or

possibly meningitis. The midwife, who had no hospital privileges, informed Corissa Mueller

that, if she took Taige to an emergency room, the doctors would likely want to conduct a chest x-

ray, urinalysis, and blood tests as well as "automatically" begin an antibiotic regimen and

perform a spinal tap to test for meningitis.

Corissa Mueller discussed the situation with her husband, Eric Mueller, and they

mutually determined that taking Taige to the emergency room would be the safe thing to do.

At around 10:00 p.m., while Eric remained at home with the couple's other children, Corissa took

Taige to the emergency room at St. Luke's Hospital in Boise, Idaho. Upon admitting Taige,

Corissa provided the hospital with her husband's name, stated that he was Taige's father, and

gave the hospital the address and telephone number where she and her husband lived. In her

deposition, Corissa explained that she remained in telephone contact with the midwife and called

her a handful of times throughout the night.

In the emergency room, Dr. Richard MacDonald examined Taige, observing that she had

a temperature of 101.3, appeared ill, and was slightly lethargic and fussy with a delayed capillary

refill and a slight rash. Concerned Taige may have meningitis or another serious bacterial

infection, Dr. MacDonald recommended Taige undergo a full septic work-up, including various

lab tests and a spinal tap and begin an antibiotic regimen. Dr. MacDonald emphasized that time

was of the essence to perform the spinal tap and administer antibiotics because in his words,

"these babies can go from bad to worse very quickly."

Despite Dr. MacDonald's warning that there was a five percent chance Taige had

contracted meningitis, Corissa, though not a medical professional, believed that the risk was

likely less than one percent. She further believed the risks associated with administering

antibiotics and performing a spinal tap outweighed the probability that Taige had meningitis.

Although Corissa Mueller consented to the performance of a chest x-ray and to the blood work,

urinalysis, and stool sample, she refused to consent to the spinal tap and antibiotics, expressing

her preference to wait until the initial lab results got back, or at least until Taige got worse.

At around 11:00 p.m. the results of Taige's lab tests became available. The results ruled

out a urinary tract infection and ear infection, but no test had been administered which could rule

out meningitis. Corissa Mueller understood the only way to rule out meningitis was to perform a

spinal tap. By that time, Taige had received intravenous fluids, her temperature was 98.9

degrees, and she had begun nursing. Although not a medical professional, Corissa believed that

there was no reason for further testing or treatment and she rejected Dr. MacDonald's offer to

obtain a second medical opinion.  Without consulting her husband, she denied permission to the

doctors to take any further diagnostic steps.

In response to Corissa Mueller's refusal to consent to the recommended procedures, Dr.

MacDonald consulted with board-certified pediatrician Dr. Noreen Womack who worked on the

pediatric floor of St. Luke's Hospital.  Dr. Womack agreed that for five-week-old infants with

Taige's symptoms the standard of care was to perform a spinal tap and antibiotics. Dr. Womack recommended that Dr. MacDonald contact a social worker if Corissa continued to withhold her consent. Dr. MacDonald contacted hospital social worker Bob Condon. Citing the hospital's policy regarding the duties of a social worker, Condon decided to contact the Health Department and local law enforcement.

At 11:39 p.m., Condon called April Auker, the on-call Risk Assessment Worker for the Health Department. Also, Condon contacted police officers Ted Snyder and Tim Green, who happened to be present in the hospital.

**B.     TUESDAY – AUGUST 13, 2002**

At around midnight, Auker arrived at the hospital emergency room. Dr. MacDonald spoke with Auker**,** Officer Snyder, and Officer Green about Taige's condition. Dr. MacDonald explained: "[I]f I took a hundred kids with the same presentation probably 95 percent of them would end up having just some viral illness; will get better in a couple of days; would be fine. I know that about 5 out of those 100 if I let them go home will die. Will die of meningitis . . . if I practice medicine the way she [Corissa Mueller] is wanting me to practice it, I would . . . I'd lose five out of a hundred kids."  Dr. MacDonald further explained that it was important that Taige be treated within a three-hour time frame.

Following the conversation with Dr. MacDonald, Officer Snyder contacted the police station, and Detective Dale Rogers was dispatched to the scene. Detective Rogers arrived in the emergency room at approximately 1:00 a.m. Officer Snyder briefed Detective Rogers on the situation. Under former Idaho Code § 16-1612, Detective Rogers as a "peace officer" had the responsibility to determine whether an endangered child should be placed in "shelter care" under temporary control of the Health Department pending a court hearing. As part of his investigation

in furtherance of this responsibility, Detective Rogers spoke with Dr. MacDonald, who advised that "[t]here could be a three to five percent chance this child could have a serious bacterial infection; meningitis or sepsis" and that treatment should begin "as soon as possible to prevent deleterious outcome such as death or brain dam-age." Dr. MacDonald further explained that "[a]s many as 5 out of 100 kids, if they had meningitis and went home untreated, could potentially die." Dr. MacDonald assured Detective Rogers that any risk associated with treatment was less than the risk associated with foregoing treatment. Dr. MacDonald added that "he had a three-hour window of opportunity, and that we were already into that window of opportunity by over two hours, two hours and 15 minutes, and we needed to make a decision."

Detective Rogers considered declaring Taige in "imminent danger" to allow Dr. MacDonald to perform the recommended procedures. Under former I.C. § 16-1612, when a law enforcement officer declared a child in imminent danger and transferred the child to the Health Department, the Health Department assumed temporary custody of that child, and could consent to medical treatment. Detective Rogers spoke with April Auker and asked whether the Health Department was prepared to take custody of Taige and, if it did, whether it would consent to the treatment Dr. MacDonald was suggesting. April Auker replied that Health Department was prepared to take custody, and would consent to the treatment.

Dr. MacDonald introduced Detective Rogers to Corissa. On three different occasions, Detective Rogers spoke with Corissa about Dr. MacDonald's desire to perform the spinal tap and administer antibiotics. Each time Detective Rogers attempted to persuade Corissa to consent to the treatment, and each time Corissa refused to consent, without consulting her husband. On at least one occasion, Detective Rogers mentioned the possibility of declaring Taige in imminent

danger and explained that if he did so, the procedures could be performed without Corissa's consent.

After her third conversation with Detective Rogers, Corissa requested a nurse take Taige's temperature again and told the nurse that if her child's temperature had not risen, she wanted to begin discharge procedures. Around this time, Corissa Mueller called her husband Eric to inform him that "Taige was doing better and that she was going to check out." At no time did Corissa Mueller ask that anyone consult with her husband.

At around 1:40 a.m., Taige's temperature was again taken and it showed that her temperature had risen to 101 degrees. Upon learning this, Corissa stepped from the examining room into the hall toward the phone with the intention of calling the midwife. However, Detective Rogers intervened and informed her based upon Taige's down-turn that he was declaring the child in imminent danger and turning custody of her over to the Health Department.

Fearful, Corissa turned back toward the examining table and her baby, but was halted by Officers Snyder and Green and Detective Rogers. With a police officer at each side, an emotional Corissa was physically escorted down the hallway to a nearby conference room. According to Officer Snyder, she was "screaming and yelling" and resisting their requests. Officers Snyder and Green remained in the room with Corissa. Officer Snyder refused to allow Corissa to make any phone calls, despite her request to call her husband. Officer Snyder told her she could use the telephone after she had talked with Detective Rogers.

Soon thereafter, Detective Rogers entered the room and presented Corissa with written notice of a post-deprivation hearing in state court. The written notice included details about the hearing date, time, and location of the hearing.  As stated in the written notice, the hearing was scheduled for 1:30 p.m. on Wednesday, August 14, 2002.

8

April Auker from the Health Department tried once again to secure Corissa's consent to the recommended medical procedures, but she refused. Detective Rogers told her that before he would allow her to use the phone she had to get herself under control.  Shortly thereafter, Officers Snyder and Green escorted Corissa to the hospital lobby and directed her to a telephone, which she used to call her husband.

Meanwhile, hospital staff had prepared a steroid injection and an antibiotic drip at Dr. MacDonald's instruction for immediate administration. However, the hospital staff waited for authorization from the Health Department to administer these medications.  Auker secured verbal permission through her supervisor Barbara Hamon from Linda Rodenbach, the State's Program Director, to authorize Taige's treatment.  Auker relayed this verbal authorization to the hospital staff, which immediately administered the steroid injection and began the antibiotic drip, which hospital records show occurred at 2:38 a.m.  Approximately 5 to 10 minutes later, Auker receives a call from her supervisor Barbara Hamon instructing Auker to stop the treatment to allow a call to be made to a deputy prosecutor.  Barbara's immediate supervisor, Linda Rodenbach, called the deputy prosecutor and asked that he contact a state court judge to authorize medical treatment.  The deputy prosecutor declined to do so and recommended that they proceed as they had been doing.  Linda Rodenbach then called Barbara Hamon and told her to authorize continued treatment.   Barbara Hamon called back instruction Auker to again authorize Taige's treatment.  Auker duly notified hospital staff and the antibiotic drip was resumed.  Based upon this last call from Barbara Hamon, Auker signed consent forms, which authorized a spinal tap (aka lumbar puncture) and also authorizing "regular and emergency medical care and treatment from licensed medical providers, without further consent if I am not available when specific consent for care would be required."  A notation on these consent forms

reveals that they were signed at 2:58 a.m.  At approximately 3:00 a.m., Dr. MacDonald performed the spinal tap.

During her last call with Barbara Hamon, Auker advised Barbara Hamon that Eric wanted to talk to someone about the situation.  Eric was still at home with the Muellers' other child.  Auker recalls leaving the hospital at approximately 3:00 a.m.

At approximately 3:00 a.m., Barbara Hamon called Eric and informed him that Taige had been declared in imminent danger, why his daughter had been declared in imminent danger, that Taige would remain at the hospital for further care, and that a court hearing would take place.  Eric went to the arrived at the hospital.

Taige was moved from the emergency room and admitted to the pediatric floor of St. Luke's Hospital under the care of pediatricians Dr. Noreen Womack and Dr. Kim.  Dr. Womack spoke with Corissa and advised her that Taige had been admitted for a "48-hour course of antibiotics at the minimum" and that they would "follow cultures at that time."

Sometime before 4:00 a.m., hospital social worker Robert Condon contacted Auker and asked whether Corissa could breast feed Taige and whether Eric could visit Taige prior to the scheduled hearing.  In response to this inquiry, Auker contacted her supervisor Barbara Hamon who instructed Auker to inform Condon that it was ok for Eric and Corissa to stay with Taige while she was in the hospital and for Corissa to breast feed Taige.  Auker relayed this information to Condon.  Eric and Corissa were immediately reunited with Taige and remained with her in the hospital until the time of the scheduled hearing.  This was the last action taken personally by Auker on behalf of the Health Department.

The Health Department by and through supervisor Janet Fletcher assigned this case to Kimberly Osadchuk, who received the file after she arrived at work on the morning of August

13, 2002.  Osadchuk contacted St. Luke's Care Coordinator, Kirsten Borgerding, who advised

that Taige's septic tests had come back negative and that the spinal tap was clear.  Borgerding

further advised that the doctors now believed that Taige had a severe cold and that Taige would

be discharged from the hospital in 48 to 72 hours.  Lastly, Borgerding advised that Dr. Womack

was not at work that day.  Osadchuk then went to St. Luke's Hospital to personally speak with

Corissa.  During this conversation, Corissa stated that she had been told that the spinal fluid was

normal and that it was hospital protocol to have Taige stay in the hospital for 48 hours be

discharge.

        After speaking to Corissa, Osadchuck staffed the case with the Ada County Prosecutor's

office.  This was necessary as it was the county prosecutor who was authorized under the law to

decide whether to pursue custody of the child at the upcoming hearing or whether to seek

dismissal and the release of Taige to her parents.  However, the county prosecutor did not

recommend releasing Taige at that time.  Taige's treating physician had stated that she would not

discharge Taige from the hospital until the 48 hour period had expired.

## C.      WEDNESDAY – AUGUST 14, 2002

        After arriving at work on August 14, 2002, Osadchuk called Dr. Womack, who stated

that Taige had mild cold symptoms and that the cultures from the spinal tap "look clear so far

and all other tests have come back negative."  Dr. Womack also stated that it was hospital

protocol to keep the child for 48 hours to ensure that the cultures were ultimately negative.  It

generally takes 48 hours to fully culture a spinal tap.  However, Dr. Womack stated that she

would agree to discharge Taige on August 14th if custody of Taige was transferred back to her

parents because Corissa had told her that she would immediately "seek medical treatment if there

was something that was of concern in the cultures." At no time previously had Dr. Womack agreed to discharge Taige.

Shortly before the hearing scheduled for 1:30 p.m., the county deputy prosecutor decided to dismiss the case and return custody of Taige to her parents based upon Dr. Womack's agreement to allow Taige to be discharged from the hospital before the expiration of the customary 48 time period and Corissa's agreement to seek immediate medical treatment if the spinal tap cultures were of any concern at the conclusion of the 48 hour period. After the start of the hearing, the county deputy prosecutor advised the Court of his decision to dismiss the case. Based thereon, the Court issued an Order finding that "reasonable efforts were made by the Department of Health and Welfare in order that Taige Mueller could return to her family home" and ordering that the case be dismissed.

## LEGAL DISCUSSION

I.   **THE EVIDENCE WILL ESTABLISH THAT ERIC MUELLER'S CONSTITUTIONAL RIGHT TO POST-DEPRIVATION NOTICE WAS SATISFIED**

   A.   **Under the circumstances of this case, notice to Corissa Mueller which is not disputed satisfied any constitutional right that Eric may have had to post-deprivation notice**

With all due respect to the Court's previous decisions in this case, it is the Health Department Employees' position that a right to post-deprivation notice singularly requires notice to only one parent of the time, date, and location of the shelter care hearing and that additional notice to a non-present parent is not required.

As this Court is aware, Detective Rogers appealed this Court's earlier decision that *both* parents were entitled to post-deprivation notice before Taige received medical intervention. This Court's earlier decision was based upon language in the case of *Wallis v. Spencer*, 202 F.3d

1126, 1138 (9th Cir. 2002).  On appeal, however, the Ninth Circuit Court of Appeals held that the

language in *Wallis* was inapplicable.  The Court of Appeals explained:

> [N]either *Wallis* nor any of the authorities upon which it relies clearly establishes
> a constitutional rule that *both* parents must be given pre-deprivation notice before
> medical intervention in the context and setting of our present case.  In *Wallis*,
> neither parent was given any notice whatsoever of the decision by the police to
> subject the children to investigatory exams.  Consequently, the question of
> whether notice to one parent and not to the other would or would not suffice to
> satisfy procedural due process was not present in the case.  It simply was not an
> issue.

*Mueller v. Auker*, 576 F.3d 979, 996 (9th Cir. 2009)(italics in original).  The Court of Appeals

also pointed out that the present case involving Taige Mueller was "a far cry from what

happened to the Wallis family" because "*Wallis* was about protecting children from parents'

possible criminal behavior, not treating a sick child taken to a hospital by her mother."  *Id*.  Thus,

the Court of Appeals held that *Wallis* did not provide a basis for requiring post-deprivation

notice to both parents before Taige received medical intervention.[2]

The Court of Appeals pointed out that Eric and Corissa both knew that it was probable

that the hospital would resort to antibiotics and a spinal tap and, despite this knowledge, Eric

chose to stay home and "entrust the medical care of his daughter to his wife." *Id*. at 996.  While

at the hospital and before any medical intervention, Corissa was (a) fully notified of the doctor's

concerns, (b) her input and reservations were solicited, (c) she was advised of the decision to

transfer custody of Taige to the Health Department and of the time, date, and location of the

shelter care hearing, and (d) she was permitted to be in a nearby area while the medical

procedures were being undertaken as suggested in the *Wallis* case.  *Id.* at 996, 997.  The Court

---

[2] Although this analysis was initially made by the Court of Appeals with regard to the right to
pre-deprivation notice, the Court of Appeals specifically held that it also applied to post-
deprivation notice as well.  The Court of Appeals explained:  "The Muellers contend that the
notice … to Corissa Mueller was insufficient to satisfy Eric Mueller's right to post-deprivation
notice.  For the reasons given earlier in this Opinion, we disagree."  *Mueller*, 576 F.3d at 997.

of Appeals further explained that "[t]here is no practical purpose in seeking consent from Eric

Mueller when Corissa Mueller had already objected" and "had Corissa Mueller consented, there

would have been no need to notify or to consult her husband." *Id.* at 997. Likewise, there would

be no practical purpose in providing post-deprivation notice to Eric because Corissa had already

received this notice and was already present in a nearby area during Taige's medical treatment

and was available if any medical information was needed by hospital staff.

Based upon the analysis of the Ninth Circuit Court of Appeals as discussed above, the

Health Department Employees respectfully request that the Court conclude that the notice

received by Corissa, which is undisputed in this case, satisfied any constitutional requirement

that Eric may have had to post-deprivation notice.

**B.      Under the facts of this case, Eric Mueller did not have a constitutional right
to receive notice of the emergency medical treatment *before* the emergency
medical treatment was administered to Taige**

With all due respect to the Court's previous decisions in this case, it is also the Health

Department Employees' position that there is no constitutional requirement mandating that the

Health Department notify parents of emergency medical treatment of children in its custody

before the emergency medical treatment can be administered. As discussed above, the Ninth

Circuit Court of Appeals has held that the *Wallis* decision requiring notice to parents before an

investigatory exam was inapplicable to this case because investigatory exams are not urgent

emergency medical treatment. The Health Department Employees are unable to locate any other

federal authority or case requiring that the Health Department notify parents before emergency

medical treatment can be constitutionally administered. Indeed, even in *Wallis*, the Court of

Appeals that examinations could be performed before parental notice is given if "some urgent

medical problem exists requiring immediate attention." *Wallis*, 202 F.3d at 1141.

The evidence at trial will reveal that the Taige's treating physician was of the opinion that Taige was experiencing a medical emergency requiring urgent medical treatment.  Given this fact, there was no constitutional requirement that the Health Department notify Eric of the emergency medical treatment before it was administered to Taige.  Eric Mueller's right to notice was satisfied by his received of notice of the scheduled shelter care hearing

C.   **The evidence at trial will reveal that Eric did in fact receive adequate notice from the Health Department Employee to satisfy his constitutional right to post-deprivation notice.**

Eric Mueller has already admitted in affidavits filed in this case that he received a telephone call from Health Department Employee Barbara Hamon at approximately 3:00 a.m. on August 13, 2002.  At trial, Barbara Hamon will confirm that she did in fact make this call to Eric and that during this call she told him that Taige had been declared in imminent danger, why his daughter had been declared in imminent danger, that Taige would remain at the hospital for further care, and that a court hearing would take place.

In the *Mueller* decision, the Ninth Circuit Court of Appeals discussed both the *timing* and *substance* of this notice by Barbara Hamon and held that it satisfied Eric Mueller's "constitutionally protected procedural due process right to post-deprivation notice."  *Mueller*, 576 F.3d at 998.  No additional information was constitutionally required.  When these facts concerning the timing and substance of the notice provided by Barbara Hamon are presented at trial, this Court must find as a matter of law in accordance with the *Mueller* decision that Eric Mueller's right to post-deprivation notice was satisfied.

II.   **THE EVIDENCE WILL ESTABLISH THAT THE PLAINTIFFS ARE NOT ENTITLED TO INJUNCTIVE RELIEF AGAINST THE HEALTH DEPARTMENT EMPLOYEES UNDER THE FACTS OF THIS CASE**

The Plaintiffs seek injunctive relief in this case.  Such relief, however, would be inappropriate under the facts of this case.  The United States Supreme Court recently clarified the standard that must be satisfied for injunctive relief as follows:  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Resource Defense Council, Inc.*, 129 S.Ct. 365, 374 (2008).[3]  The Supreme Court continued, "The factors examined above – the balance of equities and consideration of the public interest – are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent."  *Id*. at 381.  "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."  *Id*. at 381 (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546, n.12, 107 S.Ct. 1396, 1404 n.12 (1987)).

The appropriateness and scope of an injunction "raise intensely factual issues."  *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 732 (9th Cir. 1995).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 129 S.Ct. at 376.  "In each case, courts must balance the competing claims of injury and must consider the

---

[3] In the *Winter* case, the Supreme Court was considering an appeal from the Ninth Circuit in which the Ninth Circuit Court of Appeals had applied then existing standard under circuit law that only required that a party seeking a preliminary injunction to show a "possibility" of irreparable harm.  In *Winter*, the Supreme Court rejected that standard and held that there must be proof that the party is "likely" to suffer irreparable harm.  *Id*. at 373-76.  The Supreme Court explained: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id*. at 375-76.

effect on each party of the granting or withholding of the requested relief." *Id.* "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 376-77. "The principles of equity … militate heavily against the grant of an injunction except in the most extraordinary circumstances." *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999).

**A.      The evidence will reveal that Plaintiffs' are not likely to suffer irreparable harm in the absence of injunctive relief.**

As mentioned above, Plaintiffs must prove that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 129 S.Ct. at 374. The Supreme Court has emphasized that there must be proof that irreparable harm is "likely" and not just "possible." *Id.* at 374-76.

**1.      Plaintiffs are unlikely to suffer a similar alleged injury in the future because they have moved to Hawaii.**

In a decision with similarities to the instant case, the Ninth Circuit Court of Appeals discussed this particular standard. In *Coverdell v. Dept. of Social and Health Services*, 834 F.2d 758 (9th Cir. 1987), a child protective services worker learned that a woman had moved into her service region, that the woman was pregnant with her third child, and that the woman's parental rights had been terminated with regard to her eldest child. The worker attempted to visit with the woman but she refused to admit the worker into her home. When the child was born, the worker provided an affidavit which formed the basis for a court authorizing that the Department to take custody of the child. Court proceedings culminated in the woman's parental rights being terminated. Among other relief, the woman sought injunctive relief against the child protective services worker. On appeal, the Ninth Circuit Court of Appeals explained:

> …. Plaintiff must show that there is a 'credible threat' that she will again be subjected to the particular injury against which injunctive relief is sought. A

'mere physical or theoretical possibility' that the challenged conduct will again injure the plaintiff is insufficient ….

Moreover, plaintiffs showing must be objective in character; plaintiff's mere attestation that she fears a repetition of the challenged conduct is insufficient to show a likelihood of reoccurrence.

*Id*. at 766 (internal citations omitted).  Considering the record, the Court of Appeals held that the plaintiff "presented no evidence that she anticipated becoming pregnant, that she was still capable of bearing children, *that she still resided within [the worker's] service region*, or that [the worker] had taken any action or made any statement to suggest that [the plaintiff's] newborn children might be seized in the future."  *Id*. (emphasis added).  Consequently, the Court of Appeals held that the plaintiff in that case failed to satisfy her burden of proving a likelihood of similar injury in the future.

The Muellers in the instant case are no more likely to experience the same alleged injury in the future as was the plaintiff in *Coverdell*.  This is because, like the plaintiff in *Coverdell*, the Muellers have moved away out of Idaho.  The evidence at trial will show that they now live in Hawaii with no objective evidence that will ever return to Idaho.  Thus, it is unlikely that any of the Mueller children will again find themselves in an emergency room in a hospital in Idaho within the jurisdiction of the Health Department.  Because an injunction would not provide any relief to the Muellers because they now live in Hawaii, it would be improper to grant an injunction in this case.

> **2.      Plaintiffs are unlikely to suffer a similar alleged injury in the future because there is no proof that the Health Department has an unconstitutional policy or practice that resulted in the injuries claimed by the Plaintiffs.**

Even if the Muellers lived in Idaho, it would still be unlikely that they would suffer the same alleged injury in the future.  The events which led to the Muellers' claimed injury and the Health Department's involvement in those events was an isolated, unique event.  There is no

18

evidence that the Health Department has ever been presented or will ever again be presented

with a situation like that which involved the Muellers – a situation where a parent brings a child

to an emergency room in the absence of abuse or the history of abuse and a police detective

declares the child in imminent danger because the parent refuses to allow the child to receive

urgent emergency care.  An isolated incident does not justify injunctive relief.  *Immigration &*

*Naturalization Service v. Delgado*, 466 U.S. 210, 257 n.6 ("An ambiguous, isolated incident such

as this fails to provide any basis on which to conclude that respondents have shown an INS

policy entitling them to injunctive relief."); *Jensen v. Fedex Freight, Inc.*, 2009 U.S. Dist. LEXIS

116469 (Dist. Idaho Dec. 15, 2009)("one isolated incident is not a constitutional violation subject

to an injunction").

> **B.     Injunctive relief is inappropriate based upon a balance of the equities and consideration of the public interest**

When injunctive relief is sought as a means of enjoining the manner in which a state

conducts its business, additional policy consideration arise.  "When a plaintiff seeks to enjoin the

activity of a government agency, even within a unitary court system, his case must contend with

the well-established rule that the Government has traditionally been granted the widest latitude in

the dispatch of its own internal affairs."  *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976)(internal

quotation marks and citations omitted).  "The Supreme Court has repeatedly cautioned that,

absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to

conduct its business in a particular way."  *Id.* (citation omitted).  When considering whether to

grant injunctive relief against a state, the court in equity must be concerned with "maintaining

the delicate balance between 'federal equitable power and State administration of its own law'

and determining whether the relief sought 'would disrupt the normal course of proceedings in the

state courts … [and] would require for its enforcement the continuous supervision by the federal

court….'" *Hodgers-Durgin*, 199 F.3d at 1042 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 500-01 (1974)). "It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of the courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws of the Constitution." *Hodgers-Durgin*, 199 F.3d at 1043 (quoting *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996)).

        C.       **Any injunctive relief, if granted, must be strictly limited in scope**

Although it is unclear, it appears that the Plaintiffs may be seeking system-wide injunctive relief or, in other words, injunctive relief applicable to the entire Health Department throughout the entire State of Idaho. System-wide injunctive relief would be inappropriate under the facts of this case.

"The scope of injunctive relief is dictated by the extent of the violation established." *Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001)(quoting *Lewis v. Casey*, 518 U.S. 343, 359 (1996)). There is a "longstanding maxim that injunctive relief against a state agency or official must be no broader than necessary to remedy the constitutional violation." *Armstrong*, 275 F.3d at 870 (citing *Milliken v. Bradley*, 433 U.S. 267, 280 (1977)). "The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis*, 518 U.S. at 357. The Ninth Circuit Court of Appeals has explained,

> System-wide relief is required if the injury is the result of violations of a statute or the constitution that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury. However, if injunctive relief is premised upon only a few isolated violations affecting a narrow range of plaintiffs, its scope must be limited accordingly.

*Armstrong*, 275, F.3d at 870.

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court held that a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.   However, the Supreme Court has held that such injunctive relief can only be granted if the plaintiff satisfies the burden of proving an "*ongoing* violation of federal law." *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2004)(emphasis added).  With regard to this principle of law, the Ninth Circuit Court of Appeals has held that Section 1983 is "available to remedy a state's ongoing violation of federal law" and that an ongoing claim requires proof of "a systemic policy or practice that operated in part, within the limitations period—a systemic violation." *Mansourian v. Regents of the Univ. of Cal*, 2010 U.S.App. LEXIS 8487 (9th Cir. April 20, 2010)(citations omitted).

It is critically important to consider what the Plaintiffs allege in their Second Amended Complaint.  In paragraph 72 thereof, they only alleged "a practice and policy of improperly authorizing unnecessary medical treatment" and based upon that allegation seek injunctive relief. Notably, the complaint does **not** allege (1) a practice or policy of not providing post-deprivation notice to absent parents or a practice; (2) a practice or policy of not releasing children before a shelter care hearing if imminent danger has been abated.  Thus, Plaintiffs' Second Amended Complaint does not seek injunctive relief on those bases.  Rather, the allegations in the controlling complaint seek injunctive relief based solely upon and in response to an alleged practice and policy of providing "unnecessary" medical treatment.  The complaint seeks no other injunctive relief and Plaintiffs should be precluded from so seeking at trial.

It is also important to note that this does **not** allege a practice and policy of authorizing medical treatment beyond what Detective Rogers found to be the basis of his imminent danger

declaration.  It only alleges a practice and policy of authorizing "unnecessary" medical care

which determined by medical professional based upon the appropriate medical standard of care.

At trial, it will be shown that the Plaintiffs were not injured by a system-wide Health

Department policy or practice of providing unnecessary medical treatment.  Plaintiffs are also

unable to identify any other individuals who have ever claimed to have been injured by this same

alleged Health Department policy or practice.  The evidence will show that the incident

involving Taige Mueller was an isolated and unique event that occurred not because of a system-

wide agency policy or practice but rather was based upon the discretionary authority granted

Health Department employees involved in this specific event.  Injunctive relief is therefore

inappropriate.

Even if injunctive relief were granted, it would be inappropriate for an injunction to be

issued for the benefit of any other individual other than the Plaintiffs in this case.  "When

plaintiffs seek relief against a state agency, but relief on behalf of a large class of plaintiffs is

inappropriate, we will limit relief to the named plaintiffs."  *Id*.  This Court denied class

certification in this case.  Consequently, any injunctive relief issued by this Court must be

limited "to the named plaintiffs."  *Id*.

## III.  INJUNCTIVE RELIEF AGAINST THE HEALTH DEPARTMENT EMPLOYEES WOULD BE IMPROPER BECAUSE THE HEALTH DEPARTMENT DOES NOT HAVE AUTHORITY UNDER IDAHO LAW TO DISMISS A CHILD PROTECTIVE CASE

Evidence presented at trial will show that, upon declaring Taige Mueller pursuant to I.C.

§ 16-1608, Detective Rogers completed a court document entitled "Notice to Court under 16-

1613" which not only provided notice of the shelter care hearing but also, upon filing with the

Ada County Magistrate Division, invokes the jurisdiction of the state court and initiates a formal

judicial proceeding through which the state court determines whether the child should be

released from shelter care.  *See* I.C. § 16-1615(1).  In the wisdom of the Idaho legislature, only the state court having jurisdiction over the child can authorize the child's release from shelter care and dismiss the case.  I.C. § 16-1615(7); I.C. § 16-1603(1)(state court has "exclusive original jurisdiction…concerning any child …[w]ho is neglected, abused or abandoned").

Evidence presented at trial will also show that county prosecutors are appointed to prosecute all actions in the state court in which the state is interested or a party, including the judicial proceedings initiated by Detective Rogers' imminent danger declaration.  *See* § 31-2604(1).  Once this matter is initiated, it is the decision of the county prosecutor to seek dismissal of the case and release of the child.  This decision could be made by the county prosecutor before the shelter care hearing.  Although the Health Department can recommend dismissal to the county prosecutor, the Health Department is not empowered or authorized under Idaho law to make this decision.  Seeking dismissal of the case and release of the child in shelter care is within the sole discretion of the county prosecutor.

Notwithstanding, the county prosecutor has no authority to simply release the child and dismiss the case.  Rather, upon making his decision, the county prosecutor asks the state court to dismiss the case and authorize a release of the child because it is the state court that ultimately has jurisdiction over the child.  It would be a violation of Idaho law for the Health Department and an infringement of the state court's jurisdiction for the Health Department to simply release a child in shelter care without approval of the state court having been sought by the county prosecutor.

In this case, the evidence will show that the Health Department contacted a deputy county prosecutor before the spinal tap was administered but he declined to call a state court judge for treatment authorization and advised that the Health Department should go ahead with its authorization of emergency treatment.   The county prosecutor's office was against called the next day about the case but no recommendation was given by the county prosecutor's office about Taige's release.   Prior to the shelter care hearing, the Health Department recommended to the Deputy Prosecutor that the case be dismissed and that the Taige be returned to her parents. The Deputy Prosecutor did in fact determine prior to the shelter care hearing scheduled for 1:30 p.m. on August 14, 2002, to seek dismissal of the case and the release of Taige to her parents and that the state court agreed to dismiss the case and authorize the release of Taige during the hearing.   The procedure utilized was in compliance with Idaho law and demonstrates a practice that need not be enjoined.   Proceeding with the advice of counsel and seeking advice at the outset indicates a responsible and reasonable approach under the circumstances.

With all due respect, the Health Department Employees disagree with this Court's prior determined that the Health Department violated the Plaintiffs' constitutional rights by not releasing Taige prior to shelter care hearing.   Notwithstanding, it is the Health Department Employees' position that an injunction may not issue forcing the Health Department to release children prior to shelter care hearings because the Health Department is not authorized to do so under Idaho law.   Although the Health Department is empowered to make recommendations, it is only the county prosecutor and the state court which can seek and ultimately authorize the child's release.

An injunction requiring the release of children prior to a shelter care hearing can only properly be issued against the persons or entities statutorily empowered to do so.  Thus, such an injunction could only be issued against the county prosecutor and the state judiciary.  However, they are not parties to this lawsuit.  For this reason and the other reasons discussed above, it is respectfully requested that this Court deny the Plaintiffs' request for injunction relief requiring release of a child before a shelter care hearing.

## **CONCLUSION**

It is respectfully requested that the Court determine that Eric Mueller's constitutional right to post-deprivation notice was not violated and that the Plaintiffs are not entitled to injunctive relief under the circumstances of this case.

DATED this 27th day of April, 2010.

RACINE, OLSON, NYE, BUDGE
& BAILEY, CHARTERED

By _____/s/ W. Marcus W. Nye
        W. MARCUS W. NYE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of April 2010, I filed the foregoing document with the Clerk of the court using the CM/ECF system which emailed a Notice of electronic Filing to the following persons:

**Richard E Hall (Attorney For Defendant McDonald)**
reh@hallfarley.com; klm@hallfarley.com

**Kirtlan G Naylor (Attorney for Defendants Boise, Rogers, Snyder, Green)**
kgn@naylorhales.com; dlr@naylorhales.com

**W Marcus W Nye (Attorney for Auker, Osadchuk, Fletcher, Hamon, Rodenbach)**
nye@racinelaw.net

**Patricia M Olsson (Attorney for Defendant St. Lukes)**
pmo@moffatt.com; jst@moffatt.com; cld@moffatt.com; lps@moffatt.com;
ecf@moffatt.com; moffattthomas@hotmail.com

**Michael E Rosman (Attorney for Plaintiffs)**
rosman@cir-usa.org

**John L Runft (Attorney for Plaintiffs)**
jlrunft@runftlaw.com

**J Walter Sinclair (Attorney for Defendant St. Lukes)**
jwsinclair@stoel.com

**Jon M Steele (Attorney for Plaintiffs)**
jmsteele@runftlaw.com

**Colleen D Zahn (Attorney for Defendants Boise, Rogers, Snyder, Green)**
cdz@naylorhales.com

By: /s/ W. Marcus W. Nye
W. MARCUS W. NYE