IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ERIC MUELLER and CORISSA D. MUELLER, husband and wife, individually, and on behalf of TAIGE L. MUELLER, a minor, and on behalf of themselves and those similarly situated, | ) ) ) ) ) ) ) ) | Case No. CIV 04-399-S-BLW |
| Plaintiffs, | ) ) | MEMORANDUM DECISION AND ORDER |
| vs. | ) ) ) | |
| APRIL K. AUKER, KIMBERLY A. OSADCHUK, JANET A. FLETCHER, BARBARA HARMON, LINDA RODENBAUGH, THE CITY OF BOISE, DALE ROGERS, TED SNYDER, TIM GREEN, RICHARD K. MacDONALD, and ST. LUKE'S REGIONAL MEDICAL CENTER, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## INTRODUCTION

The Court has before it a number of pre-trial motions.  In this decision, the

Court will resolve the most pressing of those motions.

## LITIGATION BACKGROUND

**Memorandum Decision & Order – page 1**

The facts in this case have been set forth in other decisions and will not be repeated here.  The remaining defendants are (1) the City; (2) the State Defendants; (3) St. Luke's Hospital; and (4) Dr. Macdonald.

The Muellers have brought a § 1983 claim against two of these defendants: The City and Dr. Macdonald.  The Muellers allege that the conduct of these two defendants caused the Muellers to lose three of their due process rights: (1) their right to custody and control of their daughter Taige; (2) their right to make medical decisions for Taige (and Taige's right to have those decisions made by her parents); and (3) the right of their family to be together during medical procedures.  Taige Mueller also claims that her Fourth Amendment right against unconstitutional seizures was violated.

The City was responsible for these constitutional violations, the Muellers allege, by virtue of (1) the policy or custom of the City police; (2) the actions of a policymaker; or (3) a failure to train.  While the police officers that responded to the incident are protected by qualified immunity, their conduct is still relevant to the claims against the City.  The Muellers seek damages and equitable relief against the City.

With regard to the State Defendants, the Muellers originally alleged three constitutional violations.  The Court has since found that two of those violations

exist as a matter of law, leaving only the third for resolution here.  More specifically, the Court issued a summary judgment to the Muellers, finding as a matter of law that the Muellers due process rights were violated when (1) the State Defendants' authorization for the treatment of Taige exceeded that necessary to resolve the imminent danger to Taige, *see Memorandum Decision (docket no. 282);* and (2) the State Defendants continued to hold Taige even after the declared "imminent danger" had past.  *Id.*

On the third issue, the Court found factual disputes over whether the State Defendants satisfied Eric Mueller's constitutional right to receive notice after Taige was declared in imminent danger by Detective Rogers, which is also known as the constitutional right to post-deprivation notice.  That is the sole remaining issue for resolution against the State Defendants.  The Muellers originally sought money damages against the State Defendants, but that claim for relief has been dismissed, leaving only claims for declaratory and injunctive relief.

With regard to Dr. Macdonald, the § 1983 claim against him is now focused on a single issue:  Whether Dr. Macdonald falsely exaggerated the risk to Taige in an effort to use Detective Rogers' statutory authority – that is, to act under color of law – to deprive the Muellers of their parental rights.  The Court explains this more fully below.  The Muellers also allege that Dr. Macdonald's conduct constituted

**Memorandum Decision & Order – page 3**

the state torts of battery, false arrest, and interference with custodial relationships, as well as a violation of Idaho Code § 16-1607.  The Court has previously held that all of the Muellers' claims against Dr. Macdonald fail if the jury finds that he did not knowingly mislead Detective Rogers.  *See Memorandum Decision (docket no. 282)* at pp. 58-60.

With regard to St. Luke's, the Muellers have alleged only state law claims. More specifically, the Muellers allege that St Luke's committed (1) battery against Taige, (2) conspiracy to falsely imprison Ms. Mueller, (3) wrongful interference with custodial rights, and (4) false reporting of neglect or abuse under Idaho Code § 16-1607.  The Muellers allege that Dr. Macdonald was the agent of St. Luke's, making the hospital liable for any state law violations that Dr. Macdonald is found to have committed.

The Court will now turn to an analysis of a portion of the pending motions.

## ANALYSIS OF PENDING MOTIONS

Cross-Motions Regarding City's Expert John Sullivan

The plaintiffs have filed a motion seeking to exclude the testimony of the City's expert John Sullivan, and the City has filed a motion to allow his testimony. Sullivan had a 34-year career with the Las Vegas Metropolitan Police, rising to the position of Deputy Chief of Police, Chief of Detectives.  *See Expert Report of*

**Memorandum Decision & Order – page 4**

*Sullivan* at p. 2.  He participated in drafting department policies and was twice

chairperson of the twelve-member board of the Nevada Peace Officers Standards

and Training Committee (P.O.S.T.).  *Id*. at 2-3.

Based on this experience, he renders opinions in five general categories in

his report.  In the first category, he opines that "the actions of the involved Boise

police officers in this case were . . . appropriate, reasonable, and conducted in good

faith."  *Id*. at p. 3.  Expanding on this opinion, Sullivan opines that "the Detective

had no reasonable alternative but to declare the child in imminent danger."  *Id*. at p.

4.  He also opines that "[t]he officers' actions of temporarily restricting Ms.

Mueller's actions and movements within the hospital were reasonable and legal in

my opinion."  *Id*.  In his deposition, Sullivan testified as to the reasonableness of

various aspects of the officers' conduct.  For example, in commenting on the time

Detective Rogers had to call a judge, Sullivan testified that Detective Rogers "had

to do a preliminary investigation, and I think that 40 minutes does not sound

unreasonable before he got all of the facts and knew what course of action to take,

plus when he was told that the child should start receiving treatment within 45

minutes, I don't think that there was any undue lag time there."  *See Sullivan*

*Deposition* at p. 23.  He also testified in his deposition that calling Eric Mueller

**Memorandum Decision & Order – page 5**

was not a reasonable alternative.  *Id*. at p. 41.[1]

Sullivan's second category of opinion is that the officers' actions were in compliance with the Boise Police Department's (BPD's) Imminent Danger Policy and Procedure.  *See Sullivan Report* at p. 3.  In this category, he opines that "[p]er BPD policy . . . Detective Rogers was not required to obtain permission form the Prosecuting Attorneys Office or a Magistrate before declaring the infant was in Imminent Danger and taking the action he took."  *See Sullivan Report* at p. 4.  He also opined that "[p]er BPD policy, Officer Snyder called his supervisor and briefed him on the potential problem . . . ."  *Id*. at p. 3.

In the third category of Sullivan's opinions, he opines that the BPD's Policies and Procedures "were in compliance with the nationally and internationally recognized International Association of Chief of Police's Model Policy on Investigating Child Abuse and Neglect (Model Policy).  *Id*. at 3.  In his deposition, Sullivan testified that under the Model Policy, Detective Rogers' training was adequate even if he was never informed of Idaho Code § 16-1616.  *See Sullivan Deposition* at p. 33.

---

[1]  Sullivan's deposition answers set forth above were in response to questions from the Muellers' counsel, and were objected to in some instances by defense counsel as being beyond the scope of Sullivan's report.  It is thus unclear whether Sullivan actually intends to offer such opinions at trial.  Because deposition responses can be used to expand the scope of the expert report, *see Local Rule 26.2(b)*, the Court will include this deposition testimony in its examination of the opinions of Sullivan.

**Memorandum Decision & Order – page 6**

In the fourth category, Sullivan opines on various factual matters.  For example, in his deposition, he testified that "[t]he officers . . . seem unbiased in their reporting," and that "Ms. Mueller . . . was very . . . emotional, so she might be a little less objective than the other parties."  *Id.* at p. 11.

In his fifth and final category, Sullivan testifies that various actions are legal. In his Report, Sullivan opines that "the actions of the involved Boise police officers in this case were lawful . . . ."  *See Sullivan Report* at p. 3.  He also opines that "[p]er . . . Idaho State Statutes, Detective Rogers was not required to obtain permission form the Prosecuting Attorneys Office or a Magistrate before declaring the infant was in Imminent Danger and taking the action he took."  *See Sullivan Repor*t at p. 4.  He also "concurs" with the findings of the Boise City Ombudsman that "exonerated the involved BPD officers of any and all illegal misconduct."  *Id.* at 4-5.

The Court begins its analysis of these opinions by examining the first category – that the actions of the officers were "appropriate, reasonable, and conducted in good faith."  *Id.* at p. 3.  Expert testimony is admissible under Fed.R.Evid. 702 if it addresses an issue "beyond the common knowledge of the average layperson."  *U.S. v. Morales*, 108 F.3d 1031, 1039 (9th Cir.1997) (en banc).  Without assistance by experts, the average layperson is qualified to

determine how a reasonable person would act.  *See U.S. v. Hanna*, 293 F.3d 1080,1086 (9th Cir. 2002).  Allowing experts to opine on reasonableness "create[s] a significant danger that the jurors would conclude erroneously that they were not the best qualified to assess" reasonableness.  *Id*. at 1087.  Pursuant to this authority, the Court will grant the Muellers' motion to the extent it seeks to exclude any testimony from Sullivan that the actions of the officers were "appropriate, reasonable, and conducted in good faith."

       With regard to the second category of opinions – that the officers' actions were in compliance with the Boise Police Department's (BPD's) Policy and Procedures – the Muellers have no objection to these opinions, *see Muellers' Brief (docket no. 399)* at p. 5, and hence the Court will allow them.

       With regard to the third category – that the BPD's Policies and Procedures were in compliance with the Model Policy – Sullivan never explains the relevance of the Model Policy.  He notes that the Model Policy is "nationally and internationally recognized," *see Sullivan Report* at p. 3, but offers no further explanation of its significance.  How was it prepared, and by whom?  How many departments have adopted it?  Was it used at the Las Vegas Police Department where he worked?  Is it a standard in the "industry?"  Without answers to these questions, Sullivan's testimony that the BPD followed the Model Policy is simply

**Memorandum Decision & Order – page 8**

irrelevant and hence inadmissible.  The Court will therefore grant the Mueller's

motion to the extent it seeks to exclude any testimony from Sullivan regarding the

Model Policy.

The Court moves next to the fourth category – Sullivan's opinions on the

credibility of the officers and Ms. Mueller.  Such testimony "encroaches on the

jury's vital and exclusive function to make credibility determinations."  *See U.S. v.*

*Finley*, 301 F.3d 1000, 1015 (9th Cir. 2002).  Moreover, Sullivan fails to explain

how he brought his experience to bear in assessing the credibility of the parties.

*See Rule 702 Advisory Committee Notes - 2000 Amendments* (expert who relies

primarily on experience "must explain how that experience leads to the conclusion

reached . . ."); *see also, U.S. v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002) (citing

Rule 702 Advisory Committee Notes in requiring expert relying on experience to

explain his methodology).  In other words, Sullivan fails to explain why his

expertise gives him insight into the credibility of parties that the jury would lack.

Thus, his testimony on credibility will not "assist the trier of fact" as required by

Rule 702 and must be excluded.

In the fifth category, Sullivan testifies that the officers' actions were lawful,

and he interprets Idaho statutes.  As a general rule, "testimony in the form of an

opinion or inference otherwise admissible is not objectionable because it embraces

**Memorandum Decision & Order – page 9**

an ultimate issue to be decided by the trier of fact." *See* Fed.R.Evid. 704(a).

However, an expert witness "cannot give an opinion as to her legal conclusion, i.e.,

an opinion on an ultimate issue of law. Similarly, instructing the jury as to the

applicable law is the distinct and exclusive province of the court." *See* *Nationwide*

*Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058-59 (9th

Cir. 2008).  Here, Sullivan is giving a legal opinion, and the Court will accordingly

exclude his opinions (1) that the officers' actions were lawful or legal; (2)

interpreting Idaho statutes or testifying that the officers' complied with Idaho law;

and (3) concurring with the Ombudsman that the officers' did not act illegally.

In conclusion, Sullivan – an expert on police training – offers no opinion on

the training received by the City officers but instead focuses on the specific

conduct of the officers in this incident.  The Court will exclude, for the reasons

expressed above, any testimony from Sullivan (1) that the actions of the officers

were appropriate, reasonable, and/or conducted in good faith; (2) that the officers's

conduct, and/or the City's policies, complied with the Model Policy; (3) that the

parties were, or were not, credible; (4) that the officer's conduct was lawful or

legal; (5) interpreting Idaho statutes or testifying that the officers' complied with

Idaho law; and (3) concurring with the Ombudsman that the officers' did not act

illegally.

**Memorandum Decision & Order – page 10**

<u>Plaintiffs' Motion to Have State Defendants Tried to the Court</u>

The plaintiffs seek to have their case against the State Defendants tried to the Court because they seek only equitable relief.  The State Defendants agree to proceeding before an advisory jury, but have filed a motion to strike the equitable relief that the Court will resolve below.  The Court will grant this motion pursuant to Rule 39(c) and proceed with an advisory jury on the claims against the State Defendants.

<u>State Defendants' Motion in Limine to Strike Injunctive and Declaratory Relief Claims</u>

Because the damage claims have been dismissed against the State Defendants, the only claims remaining against them seek declaratory and injunctive relief.  By this motion, the State Defendants ask the Court to strike the demand for declaratory and injunctive relief, which would effectively dismiss the State Defendants from this lawsuit.

The State Defendants argue that the Muellers are demanding in their trial brief injunctive and declaratory relief that they never demanded in their Second Amended Complaint.  The Muellers' failure to make this demand in their complaint, the State Defendants argue, means they are precluded from seeking this relief at trial.  The Court disagrees.  Rule 54(c) states that the Court "should grant

the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  *See Arley v. United Pac. Ins. Co., 379 F.2d 183 (9th Cir. 1967)* (citing Rule 54(c) in affirming award of declaratory relief despite plaintiff's failure to include that relief in complaint).  A predictable remedy for constitutional violations includes declaratory and injunctive relief; the Mueller's demand for these remedies was not sprung on defendants at the last minute but has been part of this case long enough to render any claim of prejudice unpersuasive.  The Court therefore rejects the argument that the Muellers have waived any right to injunctive and declaratory relief.

Another ground for striking the demands for declaratory and injunctive relief, claimed by the State Defendants, is that the Muellers have moved to Hawaii, making it highly unlikely that they will ever again take their children to any hospital in Idaho.  The State Defendants rely on *Hodgers-Duran v. Lopez, 199 F.3d 1037, 1044 (9th Cir. 1999)*, and cite its holding that a plaintiff's "failure to establish a likelihood of future injury" precludes equitable relief.  *See Brief of State Defendants (docket no. 412)* at p. 7.

The Muellers' respond only to the challenges to their demand for declaratory relief because they "believe that the defendants will conform their behavior to any declaratory judgment issued by the Court, and that the issuance (or not) of

**Memorandum Decision & Order – page 12**

injunctive relief is thus in the Court's own discretion . . . ."  *See Brief of Muellers (docket no. 472)* at p. 6.  Due to the lack of response on the injunction issue, the Court will assume that the only issue now is whether the Muellers may seek declaratory relief against the State Defendants.

To refine the issues even further, the Court must clarify the type of declaratory relief at issue in this case.  Retrospective declaratory relief would declare that the State Defendants committed constitutional violations in the past; prospective relief would declare that likely future actions are unconstitutional.  *See National Audubon Society, Inc. v. Davis*, 307 F.3d 835, 847-48 (9th Cir. 2002).  Because the Eleventh Amendment bars retrospective declaratory relief being awarded against the State Defendants, only prospective declaratory relief is at issue in this case as against the State Defendants.  *See Green v. Mansour*, 474 U.S. 64 (1985) (holding that Eleventh Amendment barred retrospective declaratory and injunctive relief against state officials).

To obtain prospective declaratory relief, the Muellers must show – according to the *Hodgers* case cited by the State Defendants – that the likelihood of future harm is not speculative.  In *Hodgers,* the plaintiffs claimed that while driving in Arizona near the Mexican border, they were pulled over for no reason by the Border Patrol.  They sought prospective declaratory relief to prevent future traffic

**Memorandum Decision & Order – page 13**

stops that violate the Fourth Amendment.  The record showed that the two

plaintiffs had only been stopped once in the last decade, despite driving the

highway nearly every day.  This fact, the Circuit held, precluded declaratory relief:

> We need not consider whether plaintiffs' declaratory relief claim is ripe
> in the Article III sense because the claim fails the prudential ripeness
> inquiry, which requir[es] us to evaluate both the fitness of the issues for
> judicial decision and the hardship to the parties of withholding court
> consideration.  As the Supreme Court recently wrote, translating the
> language of injunctions and imminency into the language of declaratory
> judgments and ripeness, "A claim is not ripe for adjudication if it rests
> upon 'contingent future events that may not occur as anticipated, or
> indeed may not occur at all.' " *Texas v. United States*, 523 U.S. 296
> (1998).  Whether the named plaintiffs are likely to be stopped again by
> the Border Patrol is simply too speculative to warrant an equitable
> judicial remedy, including declaratory relief, that would require, or
> provide a basis for requiring, that the Border Patrol change its practices.

*Hodgers*, 199 F.3d at 1044. (citations omitted).

     In *Coverdell v. Dept. of Social and Health Services*, 834 F.2d 758 (9th Cir.

1987), the plaintiffs parental rights were terminated, and she sought prospective

injunctive relief to prevent that from happening again.  In a summary judgment

motion, the defendants argued that it was highly unlikely that plaintiff's parental

rights would again be terminated.  The Circuit held that the defendants' argument

in summary judgment put the burden on the plaintiff to show that it was likely she

would suffer the same harm again.  *Id.* at 766.  She failed to carry that burden

because she failed to show, among other things, that she still resided in the district

**Memorandum Decision & Order – page 14**

that had earlier terminated her parental rights.  *Id.* at 767.

In *Coverdell*, the plaintiff had a full opportunity to make a factual record on the likelihood of future harm.  In *Hodgers,* the "plaintiffs' own factual record" established the unlikelihood of harm.  *Hodgers*, 199 F.3d at 1044 (infrequent Border Patrol stops "[b]ased on plaintiffs' own factual record").

The level of certainty in *Hodgers* – and the full opportunity to create a factual record in *Coverdell* – do not exist in this case.  While it is undisputed that the Muellers now reside in Hawaii, the record reveals nothing about their future plans.  Is their residence in Hawaii temporary?  Do they intend to move back to Idaho?  Will they visit Idaho?  Without knowing answers to these questions and others, the Court cannot make findings about the ripeness or speculative nature of the Mueller's demand for declaratory relief.  *See Melendres v. Maricopa County, 2009 WL 2707241 (D.Ariz. 2009)* (refusing to strike equitable relief in absence of factual record). Given that the State Defendants filed this motion about five weeks prior to trial, there has been no adequate opportunity for the parties to establish the necessary factual record on this issue.  Accordingly, the Court will deny the motion at this time, but allow the State Defendants to pursue this issue at trial.

The Muellers respond that this line of argument should be rejected now because they were residents of Idaho when they filed their complaint, and their

**Memorandum Decision & Order – page 15**

subsequent move to Hawaii cannot be considered.  However, for declaratory relief purposes, "[t]he presence of a controversy must be measured at the time the court acts.  It is not enough that there may have been a controversy when the action was commenced if subsequent events have put an end to the controversy."  *See* 10B Wright, Miller and Kane, *Federal Practice & Procedure*, § 2757 at p. 495 (1998), *citing* Golden v. Zwickler, 394 U.S. 103, 108 (1969).

The Muellers argue that if their declaratory relief claim is deemed unripe or moot, the Court should reconsider its denial of their request for class certification. In 2005, the Muellers moved to certify a class for purposes of equitable relief, consisting of "all individuals who bring children into emergency rooms of hospitals or likely will do so in the future" and "for purposes of determining whether the state and city defendants have engaged in unlawful conduct violative of the custodial rights of parents under the Fourteenth Amendment to the United States Constitution, and whether they should be enjoined from engaging in such illegal conduct in the future."

During oral argument on the motion, the Court asked defense counsel why they were objecting to the class certification since its purpose was for equitable relief only, and not for damages: "I'm frankly wondering if there isn't some kind of an agenda here that's below the surface and not being discussed openly here,

**Memorandum Decision & Order – page 16**

because we seem to all be very concerned about it and I don't know why." *See Transcript* at p. 45.  The City's counsel responded that the Muellers "might discover other claimants that may claim damages like the [Muellers] and then they would simply join them." *Id.*  The Muellers' counsel responded that "I don't have a hidden agenda, I promise you.  The reason we brought the motion for a class certification is to avoid to [sic] problems of mootness.  There is no other reason." *Id.* at p. 54.  Earlier, the Mueller's counsel more specifically identified his mootness concerns:  "[I]ndividual named members of a class may have their claims go moot for any of a variety of reasons, *they moved*, the children grow up or whatever, and the claims become moot." *Id.* at p. 38 (emphasis added).

The Court ultimately denied the class certification.  The Court reasoned that a class action would add nothing to an individual action: "Whether a class is certified or not, a final ruling that the policy at issue is unconstitutional effectively ends the policy . . . .  This would grant to plaintiffs the full relief they seek since they are not requesting monetary damages." *See Memorandum Decision (docket no. 124)* at p. 3.

If the Muellers' move to Hawaii now renders their demand for declaratory relief moot or unripe, a central pillar of the Court's decision denying class certification is removed.  At the same time, the Muellers have knowingly created

the very mootness their attorney feared, and they fail to explain how a class could be certified just days before trial.

The bottom line is that this complex issue was raised too close to trial to be resolved prior to trial.  Thus, the parties must proceed to trial on the declaratory judgment issue, and litigate the likelihood of future damage to the Muellers.  The motion to strike will be denied.

City's Motion to Exclude Evidence of Officers' Conduct After Imminent Danger Declaration

The City seeks to exclude as irrelevant all evidence of its officers' conduct after Detective Rogers declared Taige in imminent danger:  "Nothing that occurred after the decision was made is relevant to Roger's decision, or to Rogers' analysis in coming to that decision, and any city policy that may have contributed to it." *See City Brief (docket no. 367)* at p. 3.

The Court disagrees; the evidence is relevant to damages.  The Muellers seek damages for, among other things, the emotional distress they claim to have suffered from the wrongful seizure of Taige by Detective Rogers.  *See Gilbrook v. City of Westminster, 177 F.3d 839, 859-60 (9th Cir. 1999)* (holding that damages in § 1983 action include emotional distress that is the reasonably foreseeable result of the constitutional deprivation).

**Memorandum Decision & Order – page 18**

More specifically, the Muellers will argue to the jury that it was reasonably foreseeable to the City that if a police officer seized a child from its mother, the mother would (1) become upset, (2) resist the officers' advice, (3) attempt to be with the child; (4) need to be physically restrained, and (4) suffer emotional distress as a result.  Their emotional distress argument depends in large part on the conduct of the officers after Taige was seized.  Thus, the post-seizure conduct of the officers is relevant to damages.

The evidence is also relevant to the Mueller's claim that the City deprived them of their constitutional right to be together during Taige's medical treatment. This right arises "from the liberty interest in family association." *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000).  In *Wallis*, the Circuit held that this right is "particularly compelling . . . because of the possibility that a need to make medical decisions will arise, and in part because of the family's right to be together during such difficult and often traumatic events." *Id.*

While the City argues that this claim cannot be found in the Mueller's complaint, in fact their complaint does contain the claim.  *See Second Amended Complaint (docket no. 215)* at ¶ 61 (alleging that the City deprived the Muellers of their "parental rights of custody," their rights to "make important medical decisions" and their rights "to be together during medical procedures").  Evidence

that Corissa Mueller was confined, barred from being with Taige during the medical procedures, and prohibited from calling her husband would be relevant to this claim that the Muellers' rights of family association were violated.

The City argues, however, that the evidence should be excluded under Rule 403: "Here, the introduction of evidence of Corissa's detainment by Officers Snyder and Green would have a significant tendency to suggest to the jury that they decide the imminent danger question on the basis of the actions of [Officers] Snyder and Green in detaining Corissa. Evidence of the detainment would add an emotional charge to the issue that would be completely absent without such evidence." *See City's Brief (docket no. 367)* at p. 4.

Rule 403 excludes evidence when its probative value is substantially outweighed by the danger of unfair prejudice or jury confusion. Here, the probative value of the evidence is high, as explained above. Any potential for unfair prejudice could be mitigated with a jury instruction that the propriety of the imminent danger declaration not be judged on the basis of events occurring thereafter. Accordingly, the Court cannot find that the strong probative value is substantially outweighed by the danger of unfair prejudice or jury confusion.

The City responds that finding the evidence relevant for damages purposes "is simply a back door approach to obtaining damages for dismissed claims"

**Memorandum Decision & Order – page 20**

against Officers Snyder and Green.  *See City's Reply Brief (docket no. 455)* at p. 4.

The City quotes from this Court's decision holding that the two Officers were

entitled to qualified immunity.  *Id*. at pp. 6-7.  Yet the exoneration of Officers

Snyder and Green does not preclude claims against the City.  *See Fairley v. Luman,*

*281 F.3d 913, 917 (9th Cir. 2002)*(holding that "[i]f a plaintiff establishes he

suffered a constitutional injury by the City, the fact that individual officers are

exonerated is immaterial to liability under § 1983").  The Muellers have directly

alleged their due process claims and are not attempting to sneak them in through

"the back door" as the City alleges.

For all of these reasons, the Court will deny the City's motion to exclude

evidence of the Officers' conduct after the declaration of imminent danger.

Dr. Macdonald's Motion in Limine Re Qualified Immunity

Dr. Macdonald argues that he is entitled to the same qualified immunity

granted to the governmental defendants.  The Muellers respond that qualified

immunity is an affirmative defense that Dr. Macdonald failed to plead in his

answer and therefore waived.  Dr. Macdonald has not responded to that argument.

Qualified immunity is an affirmative defense that must be pleaded in the

answer. *Siegert v. Gilley, 500 U.S. 226, 231 (1991)*.  Despite *Siegert*, the Ninth

Circuit has since held that defendants may raise the affirmative defense of qualified

**Memorandum Decision & Order – page 21**

immunity for the first time "in a motion for summary judgment . . . if the delay does not prejudice the plaintiff."  *Norwood v. Vance*, 591 F.3d 1062 (9th Cir. 2010). In this case, Dr. Macdonald has raised this affirmative defense for the first time on the eve of trial in a case that is nearly six years old.  The Court finds that these circumstances are prejudicial to the Muellers, and hence the defense has been waived.

Even if not waived, however, the defense is "generally not available to private defendants in § 1983 lawsuits."  *Clement v. City of Glendale*, 518 F.3d 1090, 1096 (9th Cir. 2008).  While *Clement* notes that private defendants may be able to assert a slightly different defense based on "good faith," Dr. Macdonald has not discussed this defense in his motion and hence it will not be considered.

Dr. Macdonald argues next that he is not a state actor.  He points to the Court's prior decision that a physician cannot become a state actor by complying with a legal duty to report suspected child abuse or neglect, and argues that the record contains no evidence that he was doing anything other than complying with his duty to report "that Taige was being medically neglected."  *See Brief of Dr. Macdonald* at p. 3.

This Court has previously ruled that "there are questions of fact as to whether Dr. Macdonald falsely exaggerated the risk to Taige in an effort to use

**Memorandum Decision & Order – page 22**

Detective Rogers' statutory authority to deprive the Muellers of their parental rights." *See Memorandum Decision (docket no. 282)* at p. 58.  Those questions of fact – identified in that decision – preclude a ruling that Dr. Macdonald is not a state actor.

For all of these reasons, the motion will be denied.  Both parties have requested that if the motion is denied, that the Court identify the remaining issues on the §1983 claims against Dr. Macdonald.  There remains a single issue: Whether Dr. Macdonald falsely exaggerated the risk to Taige in an effort to use Detective Rogers' statutory authority to deprive the Muellers of their parental rights.

Tape Recordings

The Muellers have filed a motion to admit the three cassette tapes taken from the belt recorders of Officers Green and Snyder, and the associated transcript prepared from those tapes.  The City has filed a motion to admit a portion of the belt recording of Officer Green and associated transcript; the City seeks only to introduce, for impeachment purposes, that portion of the tape recording events prior to the declaration of imminent danger.  The City objects to any recording after that declaration on the ground that it is not relevant, an argument made in a separate motion that the Court has denied above.  Dr. Macdonald has brought a

**Memorandum Decision & Order – page 23**

motion to exclude all of the recordings and transcripts.

The three cassette tapes are copies of the belt recordings of Officers Green and Snyder on the night of August 12-13, 2002, when the incident in question took place.  The Officers activated their belt recorders during certain portions of the incident to capture the conversations that took place in their presence at those times.  The tapes record conversations between – at various times – Ms. Mueller, April Auker (a State Defendant), Dr. Macdonald, Bob Condon (St Luke's Social Worker), and Officers Green, Snyder, and Rogers.  The Court has been provided with the three cassette tapes and a copy of the transcript of the tapes.

The transcript was prepared by Michelle Callaham, an Assistant Community Ombudsman for the City.  She describes how she took a transcript prepared by Ms. Meuller, listened to the tapes herself, and prepared a corrected transcript with the assistance of City Ombudsman Pierce Murphy.  *See Affidavit of Callaham (docket no. 224)* at p. 2.

Tape Recordings – Rule 901Authentication

Dr. Macdonald argues that "during certain times . . .it is not possible to distinguish who is speaking, at what time, and who else is present during the conversation."  *See Dr. Macdonald Brief (docket no. 440)* at p. 3.  From this, Dr. Macdonald concludes that the Muellers will be unable to authenticate the tapes as

required by Rule 901.

Rule 901(a) requires the proponent to offer "evidence sufficient to support a finding that the matter in question is what its proponent claims."  That is, the Muellers must show that the tapes are an accurate depiction of the conversations recorded that night.  The proponent of the evidence need only make a *prima facie* showing of authenticity "so that a reasonable juror could find in favor of authenticity or identification."  *U.S. v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir.1989).  Once the proponent meets this burden, the probative force of the evidence is an issue for the jury.  At this point, any doubts as to the authenticity of the evidence go to its weight and not to its admissibility.  *U.S. v. Robinson*, 967 F.2d 287, 292 (9th Cir. 1992).

Rule 901(b)(5) states a more specific rule applicable to voice identifications: It is sufficient that there be an "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."  Rule 901(b)(5) establishes a low threshold for voice identifications offered to determine the admissibility of recorded conversations.  *U.S. v. Bush*, 405 F.3d 909 (9th Cir. 2005).  So long as the identifying witness is "minimally familiar" with the voice he identifies, Rule 901(b) is satisfied.  *Id.*

Voice identification can be established by a person who has heard a voice at anytime under circumstances connecting it to the speaker, and lay opinion on this issue is permissible so long as the witnesses familiarity is established. *United States v. Thomas*, 586 F.2d 123 (9th Cir. 1978). Once there is a minimal showing, the jury may determine the weight to accord to that witnesses' voice identification testimony. *Id.*

Sound recordings "used in court are often partly unintelligible." *See* 31 Wright and Gold, *Federal Practice & Procedure*, § 7110 at p. 104 (2000). A recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy. *U.S. v. Abonce-Barrera*, 257 F.3d 959, 963 (9th Cir. 2001).

In this case, Ms. Mueller, a participant in the conversations, has identified the speakers from her personal knowledge. *See Mueller Statement* at ¶ 2. City Assistant Ombudsman Callahan, working with City Ombudsman Murphy, has confirmed the speakers. *See Affidavit of Callahan (docket no. 224).* No party has challenged these identifications.

In addition, the Court has reviewed a portion of the tapes. While there are unintelligible sections, the vast majority of the recording can be heard and understood. In addition, the Muellers have supplied a transcript to aid the jurors in

understanding the recordings.  The transcript can be used to decipher difficult-to-understand sections of the tape.  *See* 31 Wright and Gold, *Federal Practice & Procedure,* § 7110 at p. 109 (2000).  Despite having the transcript for over four years, the defendants have not identified any specific inaccuracies in the document to the Court; indeed Dr. Macdonald attached excerpts of the transcript in support of his motion for summary judgment back in 2007.  *See Duke Affidavit Exhibit O (docket no. 225).*

Obviously, the transcript is merely demonstrative evidence illustrating the contents of the recording, and the jury will be so instructed.  *Federal Practice & Procedure, supra,* at p. 107; *U.S. v. Rrapi*, 175 F.3d 742 (9th Cir. 1999).  The tape itself, rather than the transcript, remains the best evidence of what is on the tape.  *See U.S. v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (holding that "if somebody wanted to know the content of the tape, it itself was the best evidence of that").

The Court therefore rejects Dr. Macdonald's argument that the tapes are so garbled that plaintiffs cannot meet their *prima facie* burden under Rule 901.

Tape Recordings – Hearsay

Dr. Macdonald argues that the tape recordings are hearsay.  If offered for their truth, the statements on the recordings would be hearsay; but if merely offered

**Memorandum Decision & Order – page 27**

to show what was said, the statements are not hearsay.  *US v Valerio*, 441 F.3d 837 (9th Cir. 2006) (holding that tape recorded statements offered not for truth but to establish context of what was said are not hearsay).  The Muellers will be introducing the tapes to show what was said, and not to establish the truth of the statements.  For that purpose, the taped statements are not hearsay.

Tape Recordings – Best Evidence

Dr. Macdonald appears to invoke the Best Evidence Rule in arguing that because the participants in the recorded conversations will testify about those conversations, the tape recordings of those same conversations should not be played to the jury.  But the Best Evidence Rule – codified in Rule 1002 – merely requires that "to prove the content of a . . . recording . . ., the original . . . recording . . . is required."  Applied here, Rule 1002 would – at most – require that the original tapes be played, not that they be excluded if the participants testify.  Dr. Macdonald cites no rule that would limit a party to only one method of proving the content of a conversation.

Moreover, Rule 1002 does not even require in this case that the original tapes be played.  Rule 1003 provides that duplicates are admissible to the same extent as originals unless it would be unfair to do so or there is some question about the authenticity of the copies.  Here, no party has raised any specific

**Memorandum Decision & Order – page 28**

objection to the authenticity of the tape copies or identified any unfairness in using them.  Hence, the Court finds no problem in playing the copies.

Tape Recordings – Rule 403

Dr. Macdonald argues that the recordings and the transcript should be excluded under Rule 403 because they "do not contain the conversations Dr. Macdonald had with Detective Rogers outside of the officers' presence and therefore, they provide an incomplete picture as to what was discussed between Dr. Macdonald, Detective Rogers and others."  *See Dr. Macdonald Brief (docket no. 440)* at p. 6.  Rule 403 excludes evidence when its probative value is substantially outweighed by the danger of unfair prejudice or jury confusion.  Here, the probative value of the tapes is high: While Officers Snyder and Green are protected by qualified immunity, their actions are still critical to remaining claims of false arrest and deprivation of rights, among other claims. This strong probative value is not substantially outweighed by the danger of unfair prejudice or jury confusion caused by the limited scope of the tapes.  It is readily apparent that important conversations were not taped, and the limited scope of the tapes can be explained by the Court's instructions and counsels' argument.  The Court therefore finds that the tapes should not be excluded under Rule 403.

For all of these reasons, the Court will deny Dr. Macdonald's motion to

**Memorandum Decision & Order – page 29**

exclude the tapes, and will grant the Muellers' motion to admit the tapes.  These decisions moot the City's motion to admit just a portion of the tapes.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions regarding the testimony of John Sullivan (docket nos. 366 & 399) are GRANTED IN PART AND DENIED IN PART.  The Court will exclude, for the reasons expressed above, any testimony from Sullivan (1) that the actions of the officers were appropriate, reasonable, and/or conducted in good faith; (2) that the officers's conduct, and/or the City's policies, complied with the Model Policy; (3) that the parties were, or were not, credible; (4) that the officer's conduct was lawful or legal; (5) interpreting Idaho statutes or testifying that the officers' complied with Idaho law; and (3) concurring with the Ombudsman that the officers' did not act illegally.  The Court will admit Sullivan's testimony that the officers' actions complied with the Boise City Police Imminent Danger Policy and Procedure.

IT IS FURTHER ORDERED, that the plaintiffs' motion to have case against State Defendants tried as a bench trial (docket no. 395) is GRANTED, and the Court will use an advisory jury for the remaining claims against the State Defendants as set forth above.

**Memorandum Decision & Order – page 30**

IT IS FURTHER ORDERED, that the State Defendants motion in limine to strike and deny injunctive and declaratory relief (docket no. 412) is DENIED without prejudice to the right of the State Defendants to raise this motion again at the close of the Mueller's case-in-chief.

IT IS FURTHER ORDERED, that the City's motion in limine re Post-Imminent Danger Declaration Evidence (docket no. 367) is DENIED.

IT IS FURTHER ORDERED, that Dr. Macdonald's motion in limine re qualified immunity (docket no. 390) is DENIED.

IT IS FURTHER ORDERED, that the plaintiffs' motion to admit belt recordings (docket no. 460) is GRANTED.

IT IS FURTHER ORDERED, that Dr. Macdonald's motion to exclude recordings and transcripts (docket no. 479) is DENIED.

IT IS FURTHER ORDERED, that the City's motion in limine re police officer Green's belt recorder (docket no. 369) is DEEMED MOOT.

DATED:  **June 4, 2010**

B. LYNN WINMILL
Chief Judge
United States District Court

**Memorandum Decision & Order – page 31**