IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ERIC MUELLER and CORISSA D. MUELLER, husband and wife, individually, and on behalf of TAIGE L. MUELLER, a minor, and on behalf of themselves and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>APRIL K. AUKER, KIMBERLY A. OSADCHUK, JANET A. FLETCHER, BARBARA HARMON, LINDA RODENBAUGH, THE CITY OF BOISE, DALE ROGERS, TED SNYDER, TIM GREEN, RICHARD K. MacDONALD, and ST. LUKE'S REGIONAL MEDICAL CENTER,<br><br>Defendants. | Case No. CIV 04-399-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it a motion for new trial. The motion is fully briefed and at issue. For the reasons explained below, the Court will deny the motion. The Court will not repeat the facts of this case, which have been set forth in detail in prior opinions.

**Memorandum Decision & Order - 1**

# STANDARD OF REVIEW

While Rule 59 does not specify the grounds on which a new trial may be based, the Circuit has held that a new trial is warranted under Rule 59(a) only if the verdict is against the clear weight of the evidence, is based on false evidence, or to prevent a miscarriage of justice. *Shimko v. Guenther,* 505 F.3d 987 (9th Cir. 2007). In resolving the motion, the Court can weigh the evidence and assess the credibility of witnesses. *Id.*

An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless. *Dang v. Cross*, 422 F.3d 800, 811 (9th Cir.2005). The Court must presume prejudice where civil trial error is concerned and the burden shifts to the opposing party to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed. *Id.*

With regard to evidentiary challenges, "a party must demonstrate that the allegedly erroneous evidentiary ruling more probably than not was the cause of the result reached." *Elsayed Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1066 (9th Cir. 2002).

**<u>Introduction to Challenge to Dr. Rosen's opinions</u>**

The Muellers argue that the Court improperly allowed Dr. Peter Rosen to

testify as an expert for defendant Dr. Macdonald. Dr. Rosen offered opinions that (1) Taige Mueller had a serious bacterial infection, (2) that Dr. Macdonald's risk assessment that Taige had a 5% chance of suffering death if not treated was "a pretty good guess," *see Transcript (June 21, 2010)* at p. 93, and (3) that "Dr. Macdonald saved her life." *Id*. at 155. The Court will review each opinion after setting forth the issue under consideration and Dr. Rosen's qualifications to address that issue.

**<u>Issue Addressed by Dr. Rosen</u>**

The sole issue regarding defendant Dr. Macdonald was whether he falsely exaggerated the risk to Taige Mueller in order to deprive the Muellers of their parental rights. Based on Taige's symptoms, Dr. Macdonald made a differential diagnosis – that is, he compiled a list of Taige's potential problems with the worst problems at the top of the list. At the top of his list was a serious bacterial infection that could be lethal, like meningitis or sepsis. *See Transcript (June 15, 2010)* at p. 34-35. Dr. Macdonald told the police officers that about 5% of infants with a serious bacterial infection would die without treatment. The Muellers'expert, Dr. Shapiro, testified that numerous medical studies peg the percentage at less than 1%, rendering Dr. Macdonald's 5% figure "[g]rossly inaccurate," *see Transcript (June 15, 2010)* at p. 197, 208. The literature was so

Memorandum Decision & Order - 3

uniform on this point, Dr. Shapiro testified, that no physician familiar with the literature would believe as true a risk assessment of 5%. *Id*. at 198, 212.

**Qualifications of Dr. Rosen**

Dr. Rosen is a board certified emergency room physician who has been practicing emergency medicine for over forty years. He was Director of Emergency Medicine at the University of Chicago where he established the third emergency medicine residency in the country at the time. *Id*. at p. 48. In later years he started emergency medicine residency programs at Denver General Hospital and the University of California at San Diego. *Id*. at p. 50. In addition to his experience in emergency medicine, he had "a fairly extensive experience in internal medicine and pediatrics as well as in general surgery." *Id*. at p. 52. This included experience in evaluating and treating newborn infants in emergency rooms. *Id*. at p. 62. He has written a number of textbooks on pediatric medicine, *id*. at p. 58-59, and currently teaches emergency medicine at Harvard Medical School and the University of Arizona School of Medicine. *Id*. at p. 55.

**Dr. Rosen's Opinions**

Taige was five weeks old when she was brought into the emergency room with a fever. Dr. Rosen testified that "in that age child, fever is very rare." *Id*. at pp. 70-71. He testified that "[j]ust from the fever alone, I'm concerned that the

Memorandum Decision & Order - 4

child has a serious infection." *Id*. at p. 70. It was also significant to him that Taige was lethargic and not feeding normally. *Id*. at pp. 72-73. He noted that the infection is not easily diagnosed as viral or bacterial, but

> it's well known that viral infections are frequently superseded by bacterial infections. What starts as a viral infection interferes with the child's normal defenses, and then there is an overgrowth of bacteria. And what started as a viral disease becomes a bacterial disease.

*Id.* at p. 74. He concluded that Taige "certainly behaved as if" she had a serious bacterial infection. *Id*. at p. 83. This opinion appeared to be based on (1) Taige's fever, (2) her not feeding normally, (3) her lethargy, and (4) the fact that bacterial infections can grow out of viral infections.

A serious bacterial infection, according to Dr. Rosen, can "progress extraordinarily rapidly and can kill the child within 12 to 48 hours." *Id.* at p. 87. When asked about the accuracy of Dr. Macdonald's 5% risk assessment, Dr. Rosen testified "that was a pretty good guess at what the percentage of risk was." *Id*. at p. 93. He testified that while there are many population studies of the risks based on age, presentation, and disease, "they don't tell you anything about the patient in front of you. All they do is give you a guesstimate as to what the risk is." *Id*.

Dr. Rosen also testified that he "believe[d] that Dr. Macdonald saved her life." *Id*. at p. 155. He based this opinion on the aggressive treatment Dr. Macdonald provided with "the early use of antibiotics and fluids" that prevented her serious

bacterial infection from getting worse. *Id*. at p. 86.

Later in his testimony, Dr. Rosen testified to an additional factor that he believed warranted a diagnosis of serious bacterial infection: After Taige improved when she received intravenous fluids, "[s]he spiked another temperature, and she became, again, somewhat less responsive to her environment." *Id*. at p. 85. This relapse occurred at 1:40 p.m. *Id*. at p. 144. On cross-examination, Dr. Rosen conceded that the relapse occurred after Dr. Macdonald made his risk assessment to the police and social workers, and so could not have played any part in Dr. Macdonald's risk assessment.

This concession created a lack of "fit" under Rule 702; there must be a "fit" between the testimony and an issue in the case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591(1993). Dr. Rosen's testimony that Taige suffered from a serious bacterial infection was relevant only if it explained whether Dr. Macdonald falsely exaggerated the risk to Taige. If Dr. Rosen's opinion was based on factors occurring after the alleged false exaggeration took place, his opinion would be irrelevant to that issue.

The next day, the Muellers argued their objection to the testimony. The Court then expressed its own concerns:

> [A]fter having heard Dr. Rosen and thinking about it while the testimony was being presented, I have some pretty grave reservations

**Memorandum Decision & Order - 6**

about whether he should have been permitted to testify about the risk assessment and Dr. Macdonald's risk assessment and also the -- his opinion concerning the likelihood of a very bad outcome for Taige Mueller if the 15 lumbar puncture and antibiotics had not been administered in the way that they were, based upon his conclusion that she was suffering, indeed, from a serious or what would develop into a serious bacterial infection. My concern is that at the end of the day it's based upon Dr. Rosen simply saying: "Based upon 46 years of experience, that's what I think would have happened." When pinned down as to what the scientific basis was for that conclusion, I was initially struck by his seemingly logical 1 explanation that when you saw the spike in fever after the child was hydrated, that's an indication to him that kind of reactivated or caused the bacterial infection in Taige to kind of kick into high gear, and that explained why you had the high fever that showed up, I think, at 3:40. The problem is that occurred after Dr. Macdonald had made the risk assessment. And to me, at this point, the only real issue in this case is whether Dr. Macdonald falsely exaggerated the risk to Taige in his discussions with the police officers, all of which occurred sometime prior to the spiking of the fever, which occurred almost exactly at the time when Mrs. Mueller was advised that Taige was being taken into custody by the State to facilitate the medical treatment. That's why, yesterday, I raised the issue of – there's two prongs to the Daubert analysis. One is the reliability prong, which is that it's based upon reliable scientific methods or upon experience which can kind of rationally be connected to a conclusion; but there's also the relevance or fit requirement, which requires that the opinion be relevant to the issue at hand. The issue at hand here is whether or not there was an exaggeration, a false exaggeration of the risk assessment which was made before the information was revealed that Dr. Rosen relied upon.

*See Transcript (June 22, 2010)* at pp. 12-14.

Ultimately, the Court decided to take up the issue in post-trial motions and to allow Dr. Macdonald to briefly recall Dr. Rosen by video. During that video testimony, Dr. Rosen testified that his opinion was based solely on what was

**Memorandum Decision & Order - 7**

known about Taige's condition at the time Dr. Macdonald talked to the officers. *Id*. at p. 45. On cross-examination, Dr. Rosen clarified that he was not basing his risk assessment opinion on the belief that fever in a five-and-a-half week old infant is rare. *Id*. at p. 46. When asked what his opinion was based on, he testified as follows:

> What was, was the presentation of the child who looked ill, acted ill, and had a history of not behaving normally. She was lethargic. She was not feeding properly, and she did not have a normal initial physical examination. It was that constellation of presentation, history, and findings as to what convinced me that she was a patient who needed a mandatory fever workup and that the risk of a serious bacterial infection that Dr. Macdonald cited was very accurate.

*Id*. at p. 46.

## **Analysis of Dr. Rosen's Opinions**

Under Rule 702, an expert witness may provide opinion testimony if "the testimony is based upon sufficient facts or data" and "is the product of reliable principles and methods," which have been "applied . . . reliably to the facts of the case." The Rule "affirms the court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." *See Advisory Comm. Notes*, Rule 702 (2000).

If the expert is testifying on the basis of experience, the expert must explain how that experience is related to the opinions. *See Rule 702 Advisory Committee*

*Notes - 2000 Amendments* (expert who relies primarily on experience "must explain how that experience leads to the conclusion reached"); *see also, U.S. v. Hermanek*, 289 F.3d 1076 (9th Cir. 2002) (citing Rule 702 Advisory Committee Notes in requiring expert relying on experience to explain his methodology).

The Muellers argue that Dr. Rosen's testimony fails to explain how his "experience (or his education or medical studies or anything else) demonstrate that Taige's symptoms – that she had a fever, was lethargic, and had trouble feeding – showed that Taige faced a 5% risk of dying or suffering severe brain damage. His appeal to his general experience and refusal to explain further is another red flag of unreliability." *See Muellers Reply Brief (Dkt. 615)* at p. 5.

Dr. Rosen did not testify that the 5% figure was based on any journal article or scientific study. The evidence was all to the contrary. As explained above, the Muellers' expert, Dr. Shapiro, relied heavily on population studies showing that the risk was less than 1%. *See Transcript (June 15, 2010)* at p. 197, 208.

Dr. Rosen took an entirely different approach. While not taking issue with the articles referenced by Dr. Shapiro, he testified that the same articles "suggest that you must ignore the percentages if you are concerned about the condition of the child . . . ." *See Transcript (June 21, 2010)* at p. 103. He stressed that population-wide studies are not always precise when applied to the diagnosis of an

**Memorandum Decision & Order - 9**

individual. *Id*. at 93-103. While the percentages are a starting point, they can vary, depending on subjective factors such as the appearance and behavior of the particular patient being treated at that moment. *Id*. The emergency room physician must often rely on his or her "clinical instinct." *Id*. at p. 101.

This testimony was in direct rebuttal to Dr. Shapiro. While Dr. Shapiro testified that studies and articles showed that Dr. Macdonald's risk assessment was so wrong that it must have been a false exaggeration, Dr. Rosen stressed that in an emergency room, those studies and articles are merely a starting point and no substitute for "clinical instinct" based on the patient being treated.

Given his long and distinguished career in emergency medicine, Dr. Rosen was well-qualified to give this rebuttal opinion. It is clearly based on his experience, and Dr. Rosen explained how his experience led to this opinion.

Dr. Rosen then went further and testified that Taige was (1) suffering from a serious bacterial infection and that (2) Dr. Macdonald's risk assessment of 5% was a "pretty good guess." To explain these opinions, Dr. Rosen testified that an emergency room physician, treating a newborn, obviously cannot rely on any verbal feedback from the infant and so must rely heavily on "whether or not the child is reacting normally to mother, whether or not the child is able to eat normally, and how does the child look in terms of reacting to the environment."

*See Transcript (June 21, 2010)* at p. 72. Here, Taige was not feeding normally and was lethargic. *Id*. at pp. 72-73. Dr. Rosen testified that while these symptoms could just as likely signal a viral infection as a bacterial infection, even a viral infection could become a serious bacterial infection, including rare but potentially lethal diseases like meningitis or pneumonia. Again, certain vital symptoms of these lethal diseases – such as headache or stiff neck – require verbal feedback from the patient that an infant cannot provide. *Id*. at p. 77. These limitations are frustrating because it is well-known, according to Dr. Rosen, that early and aggressive treatment can prevent death or permanent injury. *Id*. at pp. 86-87.

At this critical juncture, the emergency room physician must rely on his "clinical instinct" and subjective factors such as behavior and appearance. *Id*. at p. 101. These factors led Dr. Rosen to the opinion that Taige's symptoms could be the result of a serious bacterial infection. He rendered this opinion considering that Dr. Macdonald was diagnosing Taige in an emergency room. This context – a physician relying on clinical instinct when time is of the essence – is important to the analysis under Rule 702, as the Circuit has recognized:

> Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment – a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to mak[e ] a sound judgment.

*See Primiano v. Cook*, 2010 WL 1660303 at *4 (9th Cir. 2010) *amending* 598 F.3d 558 (9th Cir. 2010) (internal quotations and citations omitted). The diagnosis that Taige had a serious bacterial infection was a judgment call based on clinical instinct and made under time pressure.

The diagnosis was revealed as shaky by the withering testimony of Dr. Shapiro, who attacked it convincingly from many angles. However, "[t]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 2010 WL 1660303 at *4 (quoting *Daubert*, 43 F.3d at 1313). The Court finds the methodology – relying on clinical instinct in an emergency room – sound even if the resulting opinions are weak. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at * 4.

Dr. Rosen, assuming that Taige was suffering from a serious bacterial infection, testified that in his opinion Dr. Macdonald's risk assessment of 5% was a "pretty good guess." The Muellers complain that Dr. Rosen cited no studies to back up his claim. *See Mueller's Opening Brief (Dkt. 607)* at p. 4 (arguing that the failure to cite specific studies supporting the 5% risk assessment "is fatal").

While Rule 702 requires that the opinion be based on "sufficient facts or

*See Primiano v. Cook*, 2010 WL 1660303 at *4 (9th Cir. 2010) *amending* 598 F.3d 558 (9th Cir. 2010) (internal quotations and citations omitted). The diagnosis that Taige had a serious bacterial infection was a judgment call based on clinical instinct and made under time pressure.

The diagnosis was revealed as shaky by the withering testimony of Dr. Shapiro, who attacked it convincingly from many angles. However, "[t]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano*, 2010 WL 1660303 at *4 (quoting *Daubert*, 43 F.3d at 1313). The Court finds the methodology – relying on clinical instinct in an emergency room – sound even if the resulting opinions are weak. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id*. at * 4.

Dr. Rosen, assuming that Taige was suffering from a serious bacterial infection, testified that in his opinion Dr. Macdonald's risk assessment of 5% was a "pretty good guess." The Muellers complain that Dr. Rosen cited no studies to back up his claim. *See Mueller's Opening Brief (Dkt. 607)* at p. 4 (arguing that the failure to cite specific studies supporting the 5% risk assessment "is fatal").

While Rule 702 requires that the opinion be based on "sufficient facts or

data," the lack of support in the literature is not necessarily fatal. *Primiano*, 2010 WL 1660303 at *5 ("[p]eer reviewed scientific literature may be unavailable because the issue may be too particular . . ."). Dr. Rosen testified that the issue here was too particular to be governed strictly by clinical studies. *See Transcript (June 21, 2010)* at p. 93 ("[a]nd the problem with all of the population studies is that they don't tell you anything about the patient in front of you"). His testimony was essentially that because Taige was suffering from a serious bacterial infection, the studies Dr. Shapiro cited, and their percentage figures, were not strictly applicable. The 5% figure may even be wrong, but the margin of error is reduced to the point where a finding of false exaggeration is no longer warranted. An opinion so particular cannot be excluded for the lack of support in peer-reviewed studies.

      The Muellers argue that Dr. Rosen's opinion on the 5% risk assessment was never stated in his expert report and should be excluded for that reason. The Court disagrees. The opinion was rendered in general form, enough to put the Muellers on fair notice. They also argue that allowing Dr. Rosen to clarify his testimony by video testimony was improper. The Court adheres to its ruling at trial that the standard of Rule 43(a) was satisfied.

      The Muellers also claim that the Court should not have admitted Dr. Rosen's

testimony that Dr. Macdonald saved Taige's life. However, admitted Dr. Rosen's opinion that Taige suffered from a serious bacterial infection that was treated with antibiotics and fluids, the Court refuses to exclude the further testimony that this treatment by Dr. Macdonald saved Taige's life.

For all of these reasons, the Court finds that the motion for new trial must be denied to the extent it is based on a challenge to Dr. Rosen's testimony.

## Battery Claim

The Muellers argue that their battery claim was improperly dismissed and should have been presented to the jury. The Court disagrees. An element of battery is a lack of consent. *See Neal v Neal*, 873 P.2d 871 (1994). The evidence showed conclusively that consent was given by Taige Mueller's then legal guardian to the procedures at issue. This claim was properly dismissed.

## Jury Instructions

The Muellers make various claims that the Court's jury instructions were improper. These issues have been fully argued and resolved by the Court in prior decisions. The Court finds no reason to depart from those decisions.

## Agency

The Muellers argue that the jury's presumed decision that Dr. Macdonald was not the agent of St. Lukes is against the clear weight of the evidence. There

was clear evidence of no actual agency. With regard to apparent agency, the admission document signed by Corissa Mueller refers to the Hospital and its "independent contracting physicians." *See Trial Exhibit 1* at pp. 5, 6. Although Corissa Mueller testified that she believed Dr. Macdonald was an employee of St. Luke's, the jury could have found that testimony to lack credibility. For these reasons, the Court rejects the Muellers' arguments on this issue.

**<u>Consistency of Jury Decisions</u>**

The jury concluded that Dr. Macdonald acted in bad faith and was not immune from state common-law immunity. The Muellers argue that this is irreconcilable with the jury's conclusion that Dr. Macdonald did not make a report of medical neglect in bad faith or knowing that it is false.

The Court must search for a reasonable way to read the verdicts consistently, and must consider the verdict in light of the instructions to the jury. *See California v. Altus Fin. S.A.,* 540 F.3d 992 (9th Cir. 2008). The Court's instructions on the state law statutory immunity gave as one example of bad faith the filing of a false child neglect report. But the instruction made clear that bad faith was not limited to that example but could be found whenever there was "intentional dishonesty in belief or purpose."

Because the jury later found that Dr. Macdonald did not make a report of

child neglect in bad faith, the jury must have based its earlier decision of bad faith on some factor other than a false child neglect report. The Court cannot know precisely what ground the jury relied upon, but it is enough that their decisions can be reconciled, even if the precise ground is not revealed by their Special Verdict Form. The Court therefore rejects this argument.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for new trial (docket no. 607) is DENIED.

DATED: **March 29, 2011**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge